[No. E021361. Fourth Dist., Div. Two. Apr. 14, 1999.]

SAN BERNARDINO VALLEY AUDUBON SOCIETY, Plaintiff and Appellant, v.
METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA et al., Defendants and Appellants;
RIVERSIDE COUNTY HABITAT CONSERVATION AGENCY, Real Party in Interest and Appellant.

## COUNSEL

Kate M. Neiswender; and Tara Mueller for Plaintiff and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, William S. Abbey, Deputy Attorney General; N. Gregory Taylor; Karen L. Tachiki; Norman N. Flette; Best, Best & Krieger, Gene Tanaka, Michelle Ouellette, Bryan K. Benard and Steve Anderson for Defendants and Appellants Metropolitan Water District of Southern California and the California Department of Fish and Game, and for Real Party in Interest and Appellant.

## OPINION

**HOLLENHORST, Acting P. J.**—The San Bernardino Valley Audubon Society (Audubon) filed a petition for writ of mandate which sought to compel the Metropolitan Water District of Southern California (MWD), the California Department of Fish and Game, and the Riverside County Habitat Conservation Agency (collectively, the agencies) to prepare an environmental impact report under the California Environmental Quality Act (Pub.

Resources Code, § 21000 et seq.) (CEQA) for a project on MWD land at Lake Mathews in Riverside County.

The trial court declined to order preparation of an environmental impact report, finding that a mitigated negative declaration was adequate.

Audubon appeals, contending that the record contains sufficient evidence of the requisite "fair argument" that the project may have a significant effect on the environment. The agencies contend that there is no substantial evidence in the record to support a fair argument because any significant impacts have been or could be mitigated to a level of insignificance.

A second cause of action in the petition for writ of mandate alleges that the project is intended to provide the basis for the issuance of incidental "take"[1] permits under the California Endangered Species Act (CESA), and that the statute does not authorize incidental take of endangered species. (Fish & G. Code, § 2050 et seq.)

The trial court agreed with Audubon on the CESA cause of action and issued a writ of mandate which enjoins the California Department of Fish and Game "from issuing any permits under § 2081 of CESA, or any other section of CESA, that would allow the incidental take of any endangered species with respect to the Lake Mathews Project."

The agencies appeal the trial court's finding on the CESA issues. Due to a subsequent statutory change, the parties agree that the appeal is moot, although they disagree on the proper disposition of the cause of action.

### THE PROJECT

The project consists of the adoption of the Lake Mathews Multiple Species Habitat Conservation Plan and Natural Community Conservation Plan (Project, Plan or Lake Mathews MSHCP/NCCP). The Plan affects 5,993.5 acres owned by respondent MWD around Lake Mathews in northwestern Riverside County.

As noted above, no environmental impact report was prepared for the Project. Instead, a mitigated negative declaration was prepared. The public was notified of the availability of the mitigated negative declaration by a notice which described the Project as follows: "The Lake Mathews MSHCP/NCCP is a joint conservation effort initiated by Metropolitan and the Riverside County Habitat Conservation Agency in cooperation with the U.S. Fish

---

[1] " 'Take' means hunt, pursue, catch, capture, or kill, or attempt to hunt, pursue, catch, capture or kill." (Fish & G. Code, § 86.)

and Wildlife Service and the California Department of Fish and Game. The Lake Mathews MSHCP/NCCP creates a 5,110.4-acre Multiple Species Reserve at Lake Mathews in western Riverside County. The Lake Mathews MSHCP/NCCP would serve as the basis for the issuance of incidental take permits pursuant to the provisions of Section 10 of the federal Endangered Species Act (ESA) to authorize the take of 6 currently listed species and 59 additional species that may become listed (Target Species). The Lake Mathews MSHCP/NCCP would also serve as the basis for the management authorization under Section 2081 of the California ESA and Section 2835 of the Natural Community Conservation Planning Act for the Target Species. [¶] The Mitigated Negative Declaration/Environmental Assessment identifies potentially significant environmental impacts in the areas of biological and cultural resources. Mitigation measures have been incorporated into the Lake Mathews MSHCP/NCCP, reducing these impacts to a less-than-significant level."

The purposes of the Plan may be generally summarized as follows: (1) to describe projects and activities that may result in the take of endangered species, and the measures taken to minimize and mitigate such take; (2) to provide a management program for multiple wildlife species; (3) to create a mechanism to coordinate the responsibilities of multiple public agencies; (4) to serve as the basis for the issuance of incidental take permits to allow the take of currently listed species and species that may be listed as endangered or threatened in the future; and (5) to serve "as the basis for a Section 2081 Memorandum of Understanding/Permit under the California Endangered Species Act and a Section 2835 Memorandum of Understanding/Permit under the NCCP Act for the Target Species."

The Plan envisions the creation of a mitigation bank consisting of lands owned by MWD and Riverside County Habitat Conservation Agency (RCHCA). MWD will use its share of the mitigation bank to secure Endangered Species Act authorizations and for CEQA mitigation needs for its future projects and activities around Lake Mathews and for certain outside projects. RCHCA will acquire conservation easements over areas inhabited by the Stephens' kangaroo rat in the mitigation bank and will "be given conservation credit toward a future multiple species plan for the other biological values of the habitat."

As discussed below, the Plan will clearly have foreseeable impacts to habitats and species. These impacts are set forth in the Plan, and include a category called "Outside Projects." The effects of these projects are stated as follows: "Outside Projects will draw on Metropolitan's Mitigation Bank credits after mitigation for Operations and Plan Area Projects is deducted.

An estimated 657.3 acres of habitat will be available for this purpose at the start of implementation of the Lake Mathews Plan."

The Plan also specifies mitigation of impacts to target species and their habitats by the permanent preservation of habitat in the mitigation bank and the management of such habitat in a multiple species reserve. The Plan describes mitigation measures for the various areas in the Project area, and provides for advance mitigation of all projects and activities in the areas defined as operation areas and plan area projects. This means that authorization is given now for future projects that may take endangered species.

In their brief, the agencies take the view that the Project is not a development project, but rather is "primarily a mitigation bank that will provide important environmental mitigation for potential biological impacts resulting from existing and planned Metropolitan projects . . . ." They argue that the Project is a "conservation program [that] will not cause any unmitigated environmental impacts itself, but merely provides a mechanism whereby biological mitigation can be implemented for any future projects . . . ." The agencies thus assert that the program will result in a cumulative net benefit for conservation of species in western Riverside County. The impacts on the species from future projects would be mitigated by designating habitat land in the mitigation bank as compensation for species or habitat which is taken by future construction.

The Plan includes a lengthy biological report which describes the plant and animal species presently living in the mitigation bank area. The Plan also includes an inventory and habitat evaluation, a habitat conservation and mitigation program, and copies of a mitigation bank agreement, and other agreements needed to establish the program. The Plan is complex and sophisticated, and, because it is intended to serve as the basis for take permits, it may have far-reaching effects on the 65 target species listed.

Audubon takes the view that such a comprehensive project dealing with so many endangered and threatened species requires the preparation of an environmental impact report (EIR). In its opinion, the Project is a thinly disguised method to allow MWD to take, i.e., destroy or kill, endangered and threatened species in the course of its future construction activities throughout Southern California over the next 50 years.

Audubon is particularly concerned with provisions allowing use of the mitigation bank by outside projects, by provisions for resale of mitigation rights of the same land for different species, and by alleged differences between the plan and the provisions of the agreements which implement the plan. It therefore claims that: "Despite these broad authorizations for take of

species, there will be no further public review of any take of any species by MWD or outside developers for the next fifty years, as long as they use the 'bank.' "

## The Fair Argument Test and the Standard of Review

The parties agree that the issue on appeal is whether an EIR must be prepared or not, and the parties agree that this issue is to be resolved by application of the fair argument test.

We have described this test as follows: "Under [Public Resources Code[2]] section 21151, a local agency . . . ordinarily must prepare an EIR on any project which '*may* have a significant effect on the environment.' [Citations.] Conversely, an agency may adopt a negative declaration only if there is no substantial evidence that the project '*may* have a significant effect on the environment.' [Citations.] [¶] A trial court therefore reviews an agency's decision to adopt a negative declaration using the 'fair argument' test. Under this test, the agency must prepare an EIR whenever substantial evidence in the record supports a fair argument that a proposed project may have a significant effect on the environment. [Citations.] 'If such evidence is found, it cannot be overcome by substantial evidence to the contrary.' [Citations.] [¶] 'The lead agency's determination is thus largely legal rather than factual; it does not resolve conflicts in the evidence but determines only whether substantial evidence exists in the record to support the prescribed fair argument.' [Citation.] The court's 'function is to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed "fair argument" could be made.' [Citation.]" (*Gentry* v. *City of Murrieta* (1995) 36 Cal.App.4th 1359, 1399-1400 [43 Cal.Rptr.2d 170]; *Citizens' Com. to Save Our Village* v. *City of Claremont* (1995) 37 Cal.App.4th 1157, 1167-1169 [44 Cal.Rptr.2d 288].)

"On appeal, the appellate court's 'task . . . is the same as that of the trial court: that is, to review the agency's actions to determine whether the agency complied with procedures required by law.' [Citation.] The appellate court reviews the administrative record independently; the trial court's conclusions are not binding on it. [Citations.]" (*Gentry* v. *City of Murrieta*, *supra*, 36 Cal.App.4th 1359, 1375-1376.)

## Mitigated Negative Declaration

CEQA excuses the preparation of an EIR and allows the use of a negative declaration when an initial study shows that there is no substantial

---

[2]Unless otherwise indicated, all further statutory references are to the Public Resources Code.

evidence that the project may have a significant effect on the environment. (Guidelines for Implementation of the California Environmental Quality Act [Cal. Code Regs., tit. 14, § 15070, subd. (a), hereafter Guidelines].)

If the initial study identifies potentially significant effects on the environment but revisions in the project plans "would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur" and there is no substantial evidence that the project as revised may have a significant effect on the environment, a mitigated negative declaration may be used. (§ 21064.5.) As the state Office of Planning and Research discussion following Guidelines section 15070 explains: "A Mitigated Negative Declaration is not intended to be a new kind of document. . . . [¶] [It] provides efficiencies in the process where the applicant can modify his project to avoid all potential significant effects. The applicant can avoid the time and costs involved in preparing an EIR and qualify for a Negative Declaration instead. The public is still given an opportunity to review the proposal to determine whether the changes are sufficient to eliminate the significance of the effects." (See Discussion, reprinted foll. § 15070 in 2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 1997) CEQA Guidelines, p. 1119.)

Thus, "[u]pon the issuance of an MND [mitigated negative declaration], the project opponent must demonstrate by substantial evidence that the proposed mitigation measures are inadequate and that the project as revised and/or mitigated may have a significant adverse effect on the environment." (*Citizens' Com. to Save Our Village* v. *City of Claremont, supra*, 37 Cal.App.4th 1157, 1167.)

### APPLICATION OF THE FAIR ARGUMENT TEST

 Audubon contends that an EIR should have been prepared for the Project because the record contains substantial evidence that there is a fair argument that the Project may have significant impacts on the environment, even after mitigation.

1. *Alleged Failure to Comply With Federal Law.*

Audubon argues that "The Project is complex and often the documents which explain it are contradictory. The underlying premise of the Project is that it will result in [the] take of endangered and targeted species; in order to show how the species will be impacted, we resort to how the Project fails to comply with the laws protecting endangered species."

Audubon thus first contends that the Project does not meet the requirements of the federal Endangered Species Act (16 U.S.C. § 1539(a)) for

habitat conservation plans. Essentially, this argument is that the Plan is inadequate to constitute a multiple-species habitat conservation plan, i.e., that it is insufficient to carry out its purpose of serving "as the basis for the issuance of an incidental take permit pursuant to the provisions of Section 10 of the federal Endangered Species Act . . . ." Audubon thus argues that, because the Project is inadequate under the federal law, it also fails under the state law.

Although Audubon presents its argument at length, we agree with the agencies that it is essentially irrelevant. The question of whether the Project qualifies to obtain a take permit under the federal Endangered Species Act is different from the question of whether there is a fair argument that the Project may have a significant effect on the environment under CEQA.

As the agencies point out, the record contains a memorandum of understanding that indicates that the federal Fish and Wildlife Service has already found the Project qualifies for an incidental take permit under section 10(a) of the federal law: "Concurrent with the execution of this Agreement, the SERVICE has issued a Section 10(a) Permit to METROPOLITAN authorizing the take of each of the Target Species, subject to and in accordance with the provisions of the MSHCP/NCCP and this MOU. The Section 10(a) Permit shall become effective immediately as to all Listed Species and automatically as to each other Target Species concurrent with the listing of such species as Threatened or Endangered under FESA."

We agree with the agencies that, if Audubon wished to challenge this decision, it should have filed suit in federal court. (16 U.S.C. § 1540(c).) This litigation is not the proper vehicle to determine whether the federal Fish and Wildlife Service should have issued an incidental take permit under the federal Endangered Species Act.

2. *Potential Impacts of the Project.*

Secondly, Audubon argues that there is a fair argument that the Project will have significant environmental effects and that the proposed mitigation measures are inadequate to mitigate those effects into insignificance. As noted above, CEQA allows the use of a mitigated negative declaration only where the mitigation measures modify the potentially significant impacts of the Project "to a point where clearly no significant effects would occur . . . ." (Guidelines, § 15070, subd. (b)(1).) If significant effects remain after mitigation, an EIR is required.

The Project will clearly have potentially significant impacts on the environment. According to MWD, these impacts include the following impacts

which will be potentially significant unless mitigated: (1) impacts on "[e]n-dangered, threatened, or rare species or their habitats (including but not limited to plants, fish, insects, animals, and birds"; (2) impacts on "[l]ocally designated natural communities (e.g., oak forest, coastal habitat)"; (3) impacts on "[w]etlands habitat (e.g., marsh, riparian, and vernal pool)"; (4) the Project would disturb archeological resources; and (5) the Project would affect historical resources.[3]

CEQA also describes mandatory findings of significance. (Guidelines, § 15065.) If one or more of these findings are made, an EIR must be prepared. Here, as discussed below, MWD's checklist responds affirmatively to the first mandatory finding of significance, i.e., the finding that the Project has the potential to reduce the habitat of a wildlife species, to cause a wildlife population to drop below self-sustaining levels, to threaten elimination of a plant or animal community, and to reduce the number or restrict the range of a rare or endangered plant or animal.

3. *Alleged Mitigation of Significant Impacts.*

The significant impacts described by MWD must be mitigated to a level of insignificance if a mitigated negative declaration is to be used. Otherwise, an EIR must be prepared.

The mitigated negative declaration finds that there has been appropriate mitigation. It states: "Incorporation of the minimization and mitigation measures described in the Lake Mathews MSHCP/NCCP and the additional cultural resources mitigation measures described in this environmental evaluation are sufficient to avoid degrading the quality of the environment, substantially reducing the habitat of a fish or wildlife species, causing a fish or wildlife population to drop below self-sustaining levels, threatening to eliminate a plant or animal community, reducing the number or restricting the range of a rare or endangered plant or animal, or eliminating important examples of the major periods of California history or prehistory."

A question is therefore presented as to whether there is substantial evidence in the record to support a fair argument that the stated mitigation measures may not achieve this goal.

4. *The Proposed Mitigation Measures.*

The proposed mitigation measures are described in the mitigated negative declaration as follows: "In general, the primary mitigation provided by the

---

[3]The basis for the conclusion that the project would disturb archeological and/or historical resources is unclear. According to the explanation in the mitigated negative declaration, the significant effects result from fire-related effects and ground-disturbing activities. Audubon has not raised these significant effects as an issue, and we need not discuss them further.

Lake Mathews Plan for effects on Target Species and their habitats is the permanent preservation of habitat in the Mitigation Bank and the management of such habitat in the Multiple Species Reserve. Individual projects and activities are covered by this mitigation, subject to the following terms and conditions regarding use of the Mitigation Bank and implementation of effect minimization measures."

The mitigated negative declaration states four effect-minimizing mitigation measures: (1) If a listed plant species is present, the California Department of Fish and Game would be notified at least ten days prior to any effect occurring and would be given access to the site to salvage the plants and/or collect seeds; (2) "To the maximum extent practicable, direct effects on birds which are Target Species and their occupied habitat would be avoided during their breeding seasons"; (3) "To the maximum extent practicable . . . use of pesticides and rodenticides in a manner that would harm SKR or any other listed species would be avoided and minimized"; and (4) "Where effects would occur immediately adjacent to the Multiple Species Reserve, boundaries between the Multiple Species Reserve and affected areas would be flagged and construction would be monitored to minimize the possibility that construction activities could extend into the Multiple Species Reserve."

The mitigated negative declaration also discusses other mitigation measures under three categories: (1) operations and plan area projects; (2) outside projects; and (3) projects and activities in the multiple species reserve.

The first category states: "All significant habitat effects in Operations and Plan Area Projects, including effects on Target Species, from future projects and activities in these areas are being mitigated in advance of their actual occurrence by the precommitment of mitigation credits for all habitat in those areas . . . . This advance commitment of mitigation lands covers all effects that would occur in Operations and Plan Area Projects; no additional commitment of mitigation lands or any additional mitigation would be required for any individual project or activity in these areas." The section then provides four measures, discussed below, that would be used on future projects to avoid effects to the extent possible.

In other words, establishment of the mitigation bank would allow the MWD to set aside habitat land now so that future projects could use the bank as mitigation, thus ensuring that the future construction projects could proceed with take and construction no matter how many of the listed

endangered or threatened plant or animal species were found on a future construction project site.

The second, and most troublesome, category is outside projects. It provides: "Metropolitan Mitigation Bank lands not designated for Operations and Plan Area Projects would be available for use as mitigation for the effects of Outside Projects to habitats and/or Target Species. The same credits may be used coterminously at Metropolitan's option to mitigate effects on habitat under CEQA as well as take under the state and federal ESAs."

The section goes on to provide for adoption of a complex habitat value formula to match habitat values in affected outside project areas to the available mitigation bank credits. The outside projects can be anywhere in Southern California. While acre-for-acre mitigation is generally required, the section also states that: "Mitigation for effects on federally listed species, however, would be determined on a case-by-case basis."

Audubon reads this section and others to allow for the sale of mitigation bank credits to other Southern California developers in order to allow take of endangered and threatened species anywhere in Southern California in conjunction with development of other properties, whether or not an endangered or threatened species is presently living on habitat in the mitigation bank. It also questions the legality of selling mitigation bank credits in this manner.[4]

The agencies argue that the term "outside projects" refers only to MWD's future projects outside the Plan area, not to any third party development. In support of this argument, the agencies cite the definition sections of the Plan, the cooperative management agreement, and an implementing memorandum of understanding, which so provide. Thus, the definition of "Outside Projects" refers only to MWD projects. However, the agencies neglect to

---

[4]Audubon is also concerned that the outside projects will be able to operate under the take permits issued for the mitigation bank, and that no further permits will be required, no matter what effect the outside project will have on threatened or endangered species.

Although the agencies contend that outside projects will require their own take permits, the Plan provides that: "The use of the Mitigation Bank for impacts to Target Species associated with Outside Projects is part of the implementation of the Lake Mathews MSHCP/NCCP. Consequently, the authorizations for take and prelisting assurances for Target Species are extended to Outside Projects without requiring a separate HCP and 10(a) permit and/or 2081/2835 management authorization for that project."

It therefore appears that Audubon's interpretation is the correct one. Obviously, the effective elimination of the requirement of a take permit for outside projects may have a significant effect on the threatened or endangered species.

mention that the Plan also provides for the transfer by assignment of mitigation credits to third parties.[5]

The language and intent of the mitigation banking agreement is clear. It provides for the use of habitat value units (HVU's) to mitigate MWD and third party projects elsewhere in Southern California. The agreement states: "METROPOLITAN may, at any time, assign excess HVUs that will not be needed to mitigate the Projects, and METROPOLITAN may make those values available for mitigating HVUs lost, or to be lost, because of one or more Projects of one or more third parties, which may be public agencies, nonprofit organizations, or natural or corporate persons. The assignment shall be subject to California law. The consideration, if any, paid by the third party to METROPOLITAN shall be subject to the sole determination of METROPOLITAN. The use of the HVUs thus assigned for any specific project shall be subject to the approval of the SERVICE and the DEPARTMENT and the transfer requirements specified in Volume 1 of the MSHCP/NCCP. Each unit of excess HVUs may be utilized to fulfill mitigation required under the Federal and State Endangered Species Acts to offset loss of equivalent habitat of one or more of any of the target species identified in the MSHCP/NCCP." This provision is at the heart of Audubon's concerns.

The third category refers to projects in the multiple species reserve. While such projects are not contemplated, MWD may find them necessary. If so, "effect avoidance and minimization measures identified in the Lake Mathews Plan would be implemented and appropriate mitigation would be developed in coordination with the Management Committee . . . ."

In their brief, the agencies summarize the mitigation measures to be taken under the Plan as (1) the permanent preserving of habitat in the mitigation bank and (2) managing all habitats within the mitigation bank and the State Ecological Reserve which together constitute the multiple-species reserve. They do not discuss the adequacy of these measures to overcome the significant effects found on the environmental checklist.

5. *Adequacy of the Proposed Mitigation Measures.*

Audubon argues that the proposed mitigation measures are inadequate to mitigate the potentially significant impacts of the Project or, at least, there is a fair argument that the proposed mitigation measures are inadequate.

---

[5]Elsewhere, the agencies concede that: "The remaining [mitigation bank] credits [amounting to 657 acres] will be available for Metropolitan's Outside Projects, other Metropolitan projects and activities covered by the Lake Mathews Plan *or for sale to third parties.*" The mitigation bank agreement provision plainly allows for transfer by assignment of available mitigation credits to third parties.

We agree with Audubon that there is a fair argument that the proposed mitigation measures are inadequate for several reasons.[6]

First, Audubon could fairly argue that the provisions allowing the mitigation bank to be used as mitigation for take on other projects throughout Southern California essentially gives developers a blank check to disregard endangered and threatened species on the projects, so long as they utilize the mitigation bank.[7] Such provisions greatly expand the scope of the Project.

Second, Audubon could fairly argue that the four effect-minimizing measures described above are inadequate to compensate for the take of endangered and threatened species at Lake Mathews and other locations in Southern California. We agree with Audubon that the four effect-minimizing measures quoted above are inadequate to compensate for the contemplated take, i.e., killing or destruction, of endangered and threatened species. This is especially true when the category of outside projects is examined. As discussed above, outside projects can include assignments to third parties.

Third, Audubon could fairly argue that it is improper and ineffective to allow actual take to be mitigated by potential habitat. Take pursuant to other MWD projects or assignments to third parties could occur in other areas of Southern California. If those other projects use the mitigation bank, the area preserved in the mitigation bank under the Plan is only required to be "appropriate potential habitat" for the target species. Thus, for example, an animal with limited range, such as the western spadefoot toad, would be taken in an outside project and the mitigation bank would provide mitigation for the take merely because it is potentially suitable habitat, not because any toads actually live there.

---

[6]Audubon focuses on the provisions of the mitigation banking agreement in arguing that mitigation is inadequate. It cites a section of the agreement which lists the alleged advantages of initiating mitigation before completion of environmental review of future projects. However, this section does not purport to state the methods of mitigation. It only states the alleged advantages of setting up a mitigation bank to provide for mitigation before a project is contemplated.

[7]In this regard, the case raises the issue of the propriety of deferring the question of appropriate mitigation into the future, i.e., until all acreage in the mitigation bank is reserved. Presumably, this process could continue for the full 50-year term of the agreements because additional acreage could be added to enlarge the mitigation bank.

Deferred mitigation per se is not raised as an issue, although it may become an issue at some later time. (See generally, *Gentry* v. *City of Murrieta, supra*, 36 Cal.App.4th 1359, 1393-1397.) The general rule is that: " 'A negative declaration requiring formulation of mitigation measures at a future time violates the rule that members of the public and other agencies must be given an opportunity to review mitigation measures before a negative declaration is approved.' [Citations.]" (*Id.*, at p. 1393.) As in *Gentry*, we find that a fair argument exists and we therefore do not need to consider this issue further.

Fourth, Audubon could fairly argue that calculations under the habitat value formula will have a significant effect on the endangered and threatened species. The mitigation banking agreement and its mitigation methodology exhibit provides for mitigation in terms of habitat value units. These units are calculated according to a complex equation, the gist of which is that mitigation will occur on a habitat value basis. Thus, the agreement provides: "HVUs and/or habitat acreages may be used by METROPOLITAN and any assignees for more than one species for a given Project or outside Project, to the extent such HVUs and/or habitat acreages constitute appropriate habitat for such species." As the exhibit states: "Where two or more special status species occur on the same parcel, mitigation will occur on a habitat basis, and will not require separate mitigation for each species. The use of a habitat basis will apply irrespective of whether different entities are seeking to mitigate for harm to different special status species."

As noted above, Audubon is especially concerned with provisions in the habitat value formula, and other provisions in the mitigation banking agreement, which may have the effect of allowing for resale of mitigation rights of the same land for each of the 65 different species. Audubon contends that the effect would be to allow 65 acres to be taken in outside projects for each acre in the mitigation bank.

The agencies disagree, contending that "The Mitigation Banking Agreement is drafted so that mitigation credit under the Plan is determined in acres of habitat and although that habitat may be occupied by multiple species, each mitigation credit can only be used *once* regardless of how many species occur, or may occur, on that land. [Citation.] Once the mitigation has been used or sold, it may not be used or sold again. [Citation.] Where two or more special status species occur on the same Project parcel, mitigation will occur on a habitat basis and will not require separate mitigation for each species. [Citation.]"

Without analyzing the workings of the complex habitat value formula, it appears that the habitat value formula and the quoted provisions provide substantial evidence in support of a fair argument that mitigation banking on a habitat basis will allow for a result different from an acre-for-acre or species-by-species exchange. Thus, if an outside project has six endangered or threatened species on one acre, it appears from the exhibit that the habitat value equivalent of one acre of the mitigation bank could be used to provide mitigation for all six species. This compression of habitat could have a significant effect on the six species.

Similarly, Audubon can fairly argue that the habitat value formula, the provisions for assignment to outside developers, and the use in the formula

of potential habitat, rather than actual habitat, may all combine to allow any developer in Southern California to purchase mitigating habitat for any project which would otherwise destroy an endangered or threatened species habitat. For example, if a home developer in Orange County is otherwise precluded from developing a parcel because an endangered species such as a gnatcatcher lives there, it can purchase habitat credits from the mitigation bank in Riverside County and proceed with its project, even if the habitat in the mitigation bank is only potentially suitable for the endangered species, i.e., there are no gnatcatchers living on the properties included in the mitigation bank.[8] The potential result, argues Audubon, is future destruction of gnatcatcher habitat with no equivalent protection of the gnatcatcher. It is this result which Audubon contends may be a potentially significant effect on the environment.

We agree with Audubon that the habitat value formula and the other provisions of the mitigation banking agreement discussed above provide it with a fair argument that the mitigation banking agreement may have a significant effect on the 65 target species, because, for example, occupied habitat may be replaced by unoccupied habitat in the mitigation bank.

Fifth, Audubon could fairly argue that the Plan may have significant cumulative impacts. In this regard, Audubon argues that "[t]here is no evidence in the administrative record that the take of 65 targeted species for the next 50 years will not have negative cumulative impacts on endangered species, therefore section 21083 and Guidelines section 15065 mandate an EIR be prepared."[9]

The checklist here indicates that there will be no cumulative impacts from the Project. The mitigated negative declaration concurs, stating that the Plan "balances the potentially significant adverse effects of take of up to 65 Target Species . . . with the beneficial effects of conserving and managing sensitive biological resources in the Multiple Species Reserve." In fact, it

---

[8]The same result would follow even if we disregard the assignment to third parties provision of the mitigation banking agreement and assume, as the agencies contend, that the term "Other Projects" is only intended to refer to MWD's other projects. Since MWD has other projects throughout Southern California, the effect of those other projects upon the threatened or endangered species would be the same as in the developer example.

[9]The "50 year" reference is to the term of the memorandum of understanding. Audubon raises additional concerns about the possibility of amendment of the documents without further environmental review or notice to it, the efficacy of conservation easements designed to assure permanent protection of the species in the mitigation bank, the source of funding to assure continuance of the stated mitigation measures, and the lack of any explanation of the use to be made of the proceeds of selling mitigation credits to others. We need not discuss these issues further, but assume they will be addressed in an EIR.

finds "a cumulative net positive benefit for conservation of Target Species in western Riverside County."

However, the total specific discussion of the cumulative effects of the Project on biological resources reads as follows: "Implementation of the Proposed Project would not result in significant cumulative effects to the Target Species due to the establishment of the Multiple Species Reserve and management of the Combined Reserve. *Cumulative effects associated with Outside Projects cannot be assessed at this time, but would be addressed in additional environmental documentation for those projects as appropriate.* Some of the anticipated biological impacts to the Target Species in Operations and Plan Area Projects could result in adverse cumulative impacts, however the extensive effect minimization and mitigation program provided in the Lake Mathews Plan would offset these effects and result in a regionally important reserve for sensitive species of plants and animals in western Riverside County. [¶] In summary, implementation of the Lake Mathews MSHCP/NCCP is expected to have an overall beneficial effect on the biological resources of the Plan Area."

We agree with Audubon that this summary discussion of cumulative effects is inadequate, and that the Project, as described in the Plan and the mitigated negative declaration, is so inclusive and far-reaching, especially with regard to outside and third party projects, that it is at least potentially possible that there will be incremental impacts to the various species that will have a cumulative effect on the survival of one or more of the species.

CEQA requires the Guidelines to "require a finding that a project may have a 'significant effect on the environment' if . . . [¶] . . . [t]he possible effects of a project are individually limited but cumulatively considerable." (§ 21083.) Accordingly, Guidelines section 15355 defines "cumulative impacts" as "two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts. [¶] . . . [¶] (b) The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and . . . future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time."

The Office of Planning and Research note following Guidelines Section 15355 states that this definition is a codification of the rulings in *Whitman* v. *Board of Supervisors* (1979) 88 Cal.App.3d 397 [151 Cal.Rptr. 866] and *San Franciscans for Reasonable Growth* v. *City and County of San Francisco*

(1984) 151 Cal.App.3d 61 [198 Cal.Rptr. 634]. (See Note, reprinted foll. § 15355 in 2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, CEQA Guidelines, pp. 1212.3 to 1212.4.) In each of those cases, cumulative impact analysis in the EIR was inadequate. Here, of course, no EIR was prepared and we agree with Audubon that a cumulative impact analysis was required here. Such an analysis would be particularly helpful in evaluating the effect of the apparently novel idea of providing mitigation on a habitat-for-habitat rather than species-for-species sbasis, the effect of the complex habitat value formula, which allows each acre to be used for mitigation of multiple species, the effect of allowing sale by assignment of habitat value units throughout Southern California, and the effect of allowing the trade of habitat occupied by endangered or threatened species for habitat which is merely potentially usable by such species.

Any of these effects is possibly significant enough to require preparation of an EIR. (Guidelines, §§ 15065, 15355.) Since there is substantial evidence in the record that each of these effects may occur, there is a basis for a fair argument that significant environmental effects may occur. Accordingly, an EIR is required.

We also agree with Audubon that the term "mitigation" is used in the Plan and in the mitigated negative declaration in two confusing and separate ways. First, the term is used to refer to the establishment of the mitigation bank. The mitigation bank is established to provide habitat that can be used to meet mitigation requirements for future projects. Secondly, the term refers to mitigation of the potentially significant effects on the environment of this Project. In other words, it is confusing and circular to refer to the mitigation bank established by the Project as being mitigation for the potentially significant effects on the environment of establishing the mitigation bank itself. The issue is whether there is sufficient evidence in the record to support a fair argument that the Project, including establishment of the mitigation bank, may have a potentially significant effect on the environment. There is.

6. *Summary.*

We have found, and the agencies appear to concede, that the Project will have a significant potential impact on endangered and threatened species.

Second, we have found that the documents, particularly the mitigation banking agreement, are substantial evidence in the record in support of Audubon's contentions, including contentions there is at least a fair argument that (1) mitigation bank credits can be sold to outside developers of future projects in Southern California, thus allowing for future take of

endangered and threatened species throughout the region; (2) the mitigation measures stated in the mitigated negative declaration are inadequate to compensate for the take of endangered and threatened species; (3) allowing actual take to be mitigated by potential habitat is insufficient; (4) use of the habitat value formula, which provides for mitigation banking on a habitat rather than species basis, may have a significant effect on the endangered and threatened species; (5) the Plan may have significant cumulative effects on the 65 threatened, endangered and presently unlisted species; and (6) these cumulative effects should be considered and discussed in an EIR.

Since the documents can be read in the manner advocated by Audubon, we are constrained to agree with its conclusion that there is at least a fair argument that establishment of the mitigation bank will have a potentially significant unmitigated effect on a substantial number of endangered and threatened species, as well as other species that may be listed as endangered or threatened in the future.

The fair argument is not speculative or hypothetical because the documents themselves allow for these possibilities. Thus, there is substantial evidence in the record that these potentially significant effects may occur. In other words, there is substantial evidence in the record that there is a fair argument that the potentially significant effects on the environment identified in the environmental checklist have not been mitigated into insignificance.

Most troubling in this regard is the mandatory finding of significance in the environmental checklist that the Project will have the potential to reduce habitat, cause a wildlife population to drop below self-sustaining levels, or reduce the number or restrict the range of a rare or endangered plant or animal.[10] The Guidelines provide that, if such a finding is made, the lead agency "shall find that the project may have a significant effect on the environment and thereby require an EIR to be prepared for the project . . . ." (Guidelines, § 15065.)

---

[10]Guidelines section 15065 states: "A lead agency shall find that a project may have a significant effect on the environment and thereby require an EIR to be prepared for the project where any of the following conditions occur: [¶] (a) The project has the potential to substantially degrade the quality of the environment, substantially reduce the habitat of a fish and wildlife species, cause a fish or wildlife population to drop below self-sustaining levels, threaten to eliminate a plant or animal community, reduce the number or restrict the range of an endangered, rare or threatened species, or eliminate important examples of the major periods of California history or prehistory." (See 2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, p. 1118.) If the agency makes an affirmative finding on one of the four mandatory findings of significance, it must prepare an EIR for the project. (Guidelines, § 15065.) In this case, the agency made an affirmative finding on this issue by checking the line labeled "potentially significant unless mitigation incorporated."

Despite the contrary claim in the mitigated negative declaration, our attention has not been directed to any part of the record which shows that these effects can be mitigated into insignificance, especially for the outside projects. Thus, the proper procedure for such a far-reaching project is to prepare an EIR, with the requisite public participation, and to approve it only after making appropriate findings that changes have been made which mitigate or avoid the significant effects on the environment. (§ 21081.)

We therefore agree with Audubon that the record contains substantial evidence to support a fair argument that the Project may have a significant effect on the environment. No more is required. The trial court therefore erred in approving a mitigated negative declaration for the Project and in denying Audubon's request that an EIR be required.[11]

## THE CESA ISSUE

The second cause of action in the petition for writ of mandate alleges that the Project is designed to obtain incidental take permits under Fish and Game Code section 2081, and that any such permits are void because that section does not authorize the issuance of such permits.

The cause of action was based, in part, on our decision in *San Bernardino Valley Audubon Society* v. *City of Moreno Valley* (1996) 44 Cal.App.4th 593 [51 Cal.Rptr.2d 897]. In dicta in that case, we expressed the opinion that Fish and Game Code section 2081 did not authorize the issuance of incidental take permits under the management take provisions of that section because, in part, the take in that case did not fit within the description of management take in Fish and Game Code section 2061. (44 Cal.App.4th at p. 604.) Accordingly, we noted that, if we were to decide the issue on the merits, we would find that an agency agreement providing for such take was invalid. (*Id.*, at p. 605.) However, the case was decided on a laches issue.

Subsequently, another appellate district agreed with us in the case of *Planning and Conservation League* v. *Dept. of Fish and Game* (Cal.App.,

---

[11]By limiting our discussion to the specific aspects of the Project which were challenged by Audubon, we do not mean to suggest that an EIR can or should be limited to, or focused on, those aspects. To the contrary, a full EIR should be prepared in accordance with the definition in section 21061. (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, ch. 12, p. 455 et seq.)

Since we only determine that a full EIR should be prepared for this Project, we express no opinion on any use that may be made of the EIR in the process of determining whether a full EIR is required for a subsequent project. (Remy et al., Guide to the Cal. Environmental Quality Act (9th ed. 1996) ch. 10, pp. 314-372. [describing redundancy avoidance devices in CEQA analysis].)

A074048). Review was granted in that case and it was subsequently dismissed, thus eliminating any precedential value to the opinion.

Nevertheless, the issue came to the attention of the Legislature and the statute was amended in 1997 to provide incidental take authority by permit. (Stats. 1997, ch. 567, § 3.) A new section, Fish and Game Code section 2081.1, applied the new statute to existing take permits that were authorized within certain time frames. Thus, the parties agree that the argument that the statute does not authorize incidental take permits is moot.

Before passage of the amendment, the trial court properly held that incidental take authority was lacking on the basis of the dicta in the *San Bernardino Valley Audubon Society* case.

The agencies filed this appeal to challenge the trial court's decision that incidental take was not authorized under Fish and Game Code section 2081. They correctly argue that the trial court's decision was mooted by the subsequent statutory amendment. They also argue that, if the issue was not mooted, the necessary authority could be found in the Natural Community Conservation Planning Act (NCCP Act). (Fish & G. Code, § 2800 et seq.)

The agencies therefore request that we reverse the trial court's decision on the second cause of action and remand with directions that it be dismissed as moot.[12] Audubon, on the other hand, urges that the appeal should simply be dismissed for mootness, thus allowing the erroneous trial court decision to stand. Audubon seeks to avoid a decision on the issue of whether the NCCP Act provides independent authorization for incidental take.

Since Fish and Game Code section 2081, as amended, clearly provides authorization for the incidental take permit here, we agree with Audubon that we should not decide whether the NCCP Act also provides such authorization.

Audubon relies on *Sagaser v. McCarthy* (1986) 176 Cal.App.3d 288 [221 Cal.Rptr. 746]. In that case, residents attacked the validity of an EIR and the

---

[12]On June 1, 1998, the same day as they filed their opening brief on CESA issues, the agencies filed a request that we take judicial notice of two documents which are part of the legislative history of the 1997 amendment to Fish and Game Code section 2081. (Evid. Code, § 452.)

By order filed July 7, 1998, we reserved decision on the request for judicial notice. Since all parties have conceded the effect of the 1997 amendments was to provide incidental take authority, and they have conceded that the CESA cause of action has been mooted by the legislative change, we find the legislative history to be irrelevant and therefore deny the request for judicial notice.

trial court found for respondents. While an appeal was pending, a special statute was passed to exempt the project from CEQA compliance. The respondents moved to dismiss the appeal as moot, and the appellate court granted the motion. Thus, in that case, the trial court's decision in favor of the respondents was upheld.

We agree with the agencies that this case is in a different procedural posture from *Sagaser*. In this case, a dismissal of the appeal would allow the erroneous trial court decision in favor of Audubon on this issue to stand.

Such a result would be improper. ■ "Neither a moot action nor a moot appeal should normally be decided. There is, however, one situation in which the reviewing court should refuse to decide the merits but *not dismiss the appeal:* where the action itself is moot, and the judgment was therefore improperly rendered below, dismissal of the *appeal* operates as an *affirmance of the judgment* [citation], the exact opposite of the reviewing court's intention. The correct order is *reversal* of the judgment with *directions* to the lower court to *dismiss the action.* [Citations.]" (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 654, p. 690.)

■ We therefore reverse and remand for dismissal of the second cause of action. (*Paul* v. *Milk Depots, Inc.* (1964) 62 Cal.2d 129 [41 Cal.Rptr. 468, 396 P.2d 924].)

### DISPOSITION

The judgment is reversed on the first (CEQA) cause of action in the petition for writ of mandate. The judgment is reversed on the second (CESA) cause of action in the petition for writ of mandate and it is remanded to the trial court with directions to dismiss the second cause of action in the petition for writ of mandate as moot. Audubon is to recover its costs on appeal.

Richli, J., and Gaut, J., concurred.

A petition for a rehearing was denied May 6, 1999, and the petition of defendants and appellants for review by the Supreme Court was denied July 21, 1999.