[No. E015810. Fourth Dist., Div. Two. Apr. 15, 1996.]

SAN BERNARDINO VALLEY AUDUBON SOCIETY et al., Plaintiffs and Appellants, v.
CITY OF MORENO VALLEY et al., Defendants and Respondents.

594

**COUNSEL**

Kate M. Neiswender and Mark S. Neiswender for Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Charles W. Getz IV, Assistant Attorney General, William

S. Abbey, Deputy Attorney General, Gresham, Varner, Savage, Nolan & Tilden, Allen B. Gresham, Robin B. Cochran, Kingsley Hines, Donald A. Redd, Michael Gonzales, William T. Elston, Douglas P. Ditonto, Michael D. Montoya, Nino J. Mascolo, N. Gregory Taylor, Karen L. Tachiki, Jarlath Oley, Norman N. Flette, Woodrow D. Smith, Joyce A. Padleschat, Nazila Y. Levy, Best, Best & Krieger, Gene Tanaka, Susan C. Nauss, Michele Ouellette, Beth Eagleson and C. Larry Davis for Defendants and Respondents.

## OPINION

**HOLLENHORST, J.**—San Bernardino Valley Audubon Society and Friends of the Northern San Jacinto Valley (collectively Audubon) filed a petition for writ of mandate challenging approvals for the Moreno Highlands development. The second cause of action, alleging violations of the California Endangered Species Act (CESA) (Fish & G. Code, § 2050 et seq.)[1] was severed for trial. The trial court determined CESA allowed the Department of Fish and Game (Department) to issue permits for "take"[2] of an endangered species, the Stephens' Kangaroo Rat (SKR), which would result from the development. Audubon appeals from the trial court's order denying its petition for writ of mandate as to the second cause of action.

## FACTS

Moreno Highlands (the project) is a proposed development project in Moreno Valley. The project site consists of 3,038 acres of flat and rolling grasslands bounded on the northeast by the Badlands area, on the south by the San Jacinto Wildlife Area, on the southeast by the Lake Perris State Recreation Area, and on the east and west by agricultural land. The project site contains occupied habitat of the SKR.

The SKR is a small, nocturnal mammal related to the squirrel family of rodents. The SKR inhabits flat grasslands and coastal sage habitat of western Riverside County and northern San Diego County. The SKR has been listed as a federal endangered species since October 1988. The continued existence of the species has been threatened by loss of habitat which occurred, starting in the late 1800's, from dry farming and livestock production, and more recently, through grading and development connected with urbanization of large portions of western Riverside County. Historically, SKR habitat was distributed patchily over 300,000 acres of land; now, the SKR occupies only about 22,000 acres.

---

[1] All further statutory references are to the Fish and Game Code unless otherwise indicated.

[2] To "take" means to kill, hunt, capture, or pursue an endangered species. (§ 86.)

In July 1990, the developer submitted a new specific plan (Specific Plan 212-1) to the City of Moreno Valley (City), proposing 7,763 dwelling units and a 650-acre business park for the project site.[3] The City prepared a draft environmental impact report (EIR) for Specific Plan 212-1 and circulated it for public review in June 1991.

Meanwhile, in 1990, the Riverside County Habitat Conservation Agency (RCHCA) was formed as a joint powers agency to "plan for, acquire, administer, operate, and maintain land and facilities for ecosystem conservation and habitat reserves to implement habitat conservation plan for the Stephen's Kangaroo Rat and other listed or candidate threatened and endangered species." In October 1990, the Department entered into an agency agreement with the Cities of Riverside, Corona, Hemet, Lake Elsinore, Moreno Valley, Perris, and Temecula; the County of Riverside;[4] and the RCHCA.

The agency agreement was labelled a permit under section 2081, allowing take of the SKR so long as mitigation measures were taken in accordance with certain federal agreements and plans, including the Short-Term Habitat Conservation Plan (Short-Term Plan) and the implementation agreement, the provisions of which are summarized below.

Under the agency agreement, the Department authorized RCHCA's member agencies to take SKR's within certain areas and under specified conditions. Developers within those areas were required to pay fees or donate lands which RCHCA would use to acquire and protect habitat occupied by the SKR. For each acre of occupied habitat taken, acquisition of an acre of occupied habitat was required. The specific purpose of the agency agreement was to "acquire off-site mitigation lands, protect such lands and provide for the long-term operation and maintenance of such mitigation habitat on an acre-by-acre basis."

The purpose of the Short-Term Plan incorporated into the agency agreement was to ensure survival of the SKR in western Riverside County and to provide satisfactory mitigation for the take authorized by the agency agreement. The Short-Term Plan required: (1) the collection of a mitigation fee of $1,950 per acre on new development within a specified area of Riverside County to fund the evaluation and acquisition of permanent reserves; (2) the

---

[3]The developer earlier had proposed more dwelling units and less acreage devoted to the business park at the project site. Staff comments during the review of the earlier proposal had led the developer to reconfigure its plan for the project.

[4]The Cities of Corona, Hemet, Lake Elsinore, Moreno Valley, Perris, Riverside, and Temecula and the County of Riverside are referred to collectively as the member agencies.

identification of areas in western Riverside County that currently contain occupied SKR habitat and that might be suitable for reserves; (3) the initiation of technical studies and land use analyses to evaluate potential reserve sites; and (4) the establishment of an interjurisdictional task force to oversee and implement the reserve program.

The implementation agreement, also incorporated into the agency agreement, provided mechanisms for carrying out the Short-Term Plan. The implementation agreement provided for collecting mitigation fees and identifying other sources of funding to purchase the reserves.

In February 1992, the City, the United States Fish and Wildlife Service, the Department, and the developer issued a joint proposal as an addendum to the final environmental impact report (FEIR) for the project. The purpose of the joint proposal was to mitigate the project's impacts on the endangered SKR. The joint proposal noted several new impacts on the SKR population.

In March 1992, the City approved Specific Plan 212-1, amended the zoning to conform to Specific Plan 212-1, and amended the general plan. The City issued a statement of overriding considerations, stating that all environmental impacts of the project that could not be mitigated were insignificant in light of the economic and social significance of the project to the City. The City approved the FEIR, which incorporated by reference the agency agreement and joint proposal.

Audubon filed a petition for writ of mandate on April 16, 1992, seeking to set aside the City's approvals for the project. Originally, Audubon named only the Department and the City as defendants; however, the City moved to join as defendants to the second cause of action RCHCA, the member agencies, and other indispensable parties, including Metropolitan Water District of Southern California (Metropolitan Water District); San Diego Gas and Electric Company; Southern California Edison Company (Edison); and Southern California Gas Company.[5] The court granted those motions. Meanwhile, in December 1992, the court severed the second cause of action alleging violation of CESA from other causes of action.[6]

---

[5]Metropolitan Water District, San Diego Gas & Electric Company, Edison, and Southern California Gas Company were indispensable parties because all had obtained permits to undertake development projects or maintenance of their facilities in the area encompassed by the agency agreement.

[6]After a separate trial, the trial court denied the petition as to the other causes of action. Audubon has filed a separate appeal from the judgment in the severed action.*

*Reporter's Note: *San Bernadino Valley Audubon Society* v. *Marino Valley* (Apr. 17, 1996) E014593 (nonpub. opn.).

Following trial on the second cause of action, the trial court denied the petition on the ground the issuance of the permit was a legislative act, and the trial court would therefore not disturb it. The court stated, "All the court can do is to rule that the agreement is not a sham or capricious act by the legislative body."

This appeal ensued.

## DISCUSSION[7]

### I. *Legality of Agency Agreement*

■ Audubon contends CESA prohibits the take of endangered species incidental to private development, and the agency agreement violated that prohibition.

### A. *Standard of Review.*

■ The interpretation of CESA and the application of CESA to undisputed facts are pure issues of law; thus, this court is free to ignore the decision of the trial court and to exercise independent judgment on the merits. (*Department of Fish & Game* v. *Anderson-Cottonwood Irrigation Dist.* (1992) 8 Cal.App.4th 1554, 1561 [11 Cal.Rptr.2d 222]; *Dean W. Knight & Sons, Inc.* v. *State of California* ex rel. *Dept. of Transportation* (1984) 155 Cal.App.3d 300, 305-306 [202 Cal.Rptr. 44].)

### B. *Interpretation of Endangered Species Act.*

Under CESA, the Department may not allow take of an endangered species except in specific and limited circumstances. (§§ 2080, 2081; see also *Department of Fish & Game* v. *Anderson-Cottonwood Irrigation Dist., supra,* 8 Cal.App.4th 1554.) Section 2080 states, "No person shall import into this state, export out of this state, or take, possess, purchase, or sell within this state, any species, or any part or product thereof, that the commission determines to be an endangered species or a threatened species, or attempt any of these acts, except as otherwise provided in this [act], . . ."

---

[7]The RCHCA and the member agencies filed a respondent's brief which was joined by Metropolitan Water District, the Department, Edison, Southern California Gas Company, and San Diego Gas and Electric Company.

The City filed a separate respondent's brief which was joined by Southern California Gas Company and the Department.

Southern California Gas Company filed a separate respondent's brief which was joined by Edison.

The Department filed a separate respondent's brief which was joined by Southern California Gas Company.

Section 2081 states, "Through permits or memorandums of understanding, the department may authorize individuals, public agencies, universities, zoological gardens, and scientific or educational institutions, to import, export, take, or possess any endangered species, threatened species, or candidate species for scientific, educational, or management purposes."

■ RCHCA contends the take authorized by the agency agreement was take for management purposes and was thus authorized under section 2081. The interpretation of the meaning of take for management purposes under section 2081 is an issue of first impression.

■ Our first objective in interpreting a statute is " 'to ascertain and effectuate legislative intent. [Citations.] In determining intent, we look first to the words themselves. [Citations.] When the language is clear and unambiguous, there is no need for construction. [Citation.] When the language is susceptible of more than one reasonable interpretation, however, we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part. [Citations.]' [Citation.]" (*Department of Fish & Game* v. *Anderson-Cottonwood Irrigation Dist.*, *supra*, 8 Cal.App.4th at p. 1562.)

■ Laws providing for the conservation of natural resources are of great remedial and public importance and thus should be construed liberally. (See *Blumenfeld* v. *San Francisco Bay Conservation etc. Com.* (1974) 43 Cal.App.3d 50, 56 [117 Cal.Rptr. 327].)

The Legislature included within CESA certain definitions that govern the construction of its provisions. (§ 2060.) Those definitions include the following: " 'Conserve,' 'conserving,' and 'conservation' mean to use, and the use of, all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. These methods and procedures include, but are not limited to, all activities associated with scientific resources management, such as research, census, law enforcement, habitat acquisition, restoration and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking." (§ 2061.)

In addition, in two separate statutory sections, the Legislature expressed the objects to be achieved and the evils to be remedied in enacting CESA. (§§ 2051, 2052.)

Section 2051 states, "The Legislature hereby finds and declares all of the following:

"(a) Certain species of fish, wildlife, and plants have been rendered extinct as a consequence of man's activities, untempered by adequate concern and conservation.

"(b) Other species of fish, wildlife, and plants are in danger of, or threatened with, extinction because their habitats are threatened with destruction, adverse modification, or severe curtailment, or because of overexploitation, disease, predation, or other factors.

"(c) These species of fish, wildlife, and plants are of ecological, educational, historical, recreational, [aesthetic], economic, and scientific value to the people of this state, and the conservation, protection, and enhancement of these species and their habitat is of statewide concern." (§ 2051.)

Section 2052 states, "The Legislature further finds and declares that it is the policy of the state to conserve, protect, restore, and enhance any endangered species or any threatened species and its habitat and that it is the intent of the Legislature, consistent with conserving the species, to acquire lands for habitat for these species."

The Federal Endangered Species Act (FESA) (16 U.S.C. § 1531 et seq.) was enacted in 1973. FESA did not originally allow for incidental take for projects other than those carried out by the federal government. However, in 1982, Congress amended FESA to establish a permit process that allowed take of endangered species "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity" such as private development, under specified circumstances. (16 U.S.C. § 1539(a)(1)(B).)[8] States are free to adopt laws or regulations concerning the taking of an endangered species or threatened species that are more restrictive than FESA. (16 U.S.C. § 1535(f).)

Under FESA, the relocation of an endangered species or the alteration of its habitat during construction activities constitutes an incidental taking that

---

[8]"The Secretary may permit, under such terms and conditions as he shall prescribe—
"(A) any act otherwise prohibited by section 1538 of this title for scientific purposes or to enhance the propagation or survival of the affected species, including, but not limited to, acts necessary for the establishment and maintenance of experimental populations pursuant to subsection (j) of this section; or
"(B) any taking otherwise prohibited by section 1538(a)(1)(B) of this title if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." (16 U.S.C. § 1539(a)(1)(A), (B).)

is prohibited by the FESA unless the Secretary of Interior issues a special permit. (See *City of Las Vegas* v. *Lujan* (D.C. Cir. 1989) 891 F.2d 927, 929 [282 App.D.C. 57].)

▎██ In 1984, the California Legislature adopted CESA. CESA was in large part modelled upon FESA; thus, federal decisional law must be given great weight. (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 261 [104 Cal.Rptr. 761, 502 P.2d 1049], disapproved on another ground in *Kowis* v. *Howard* (1992) 3 Cal.4th 888, 896-897 [12 Cal.Rptr.2d 728, 838 P.2d 250].) The Legislature is presumed to have been aware of the federal "incidental take" provisions. (*People* v. *Weidert* (1985) 39 Cal.3d 836, 844 [218 Cal.Rptr. 57, 705 P.2d 380].) However, the California Legislature chose not to include those provisions in CESA.

RCHCA argues that "management" is not defined in CESA, and in light of CESA's purpose and legislative history, the Department's interpretation should be adopted. (*DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 17-18 [194 Cal.Rptr. 722].) ██ In interpreting a statute, we give great deference to an agency's interpretation of its governing statutes. (*Western Oil & Gas Assn.* v. *Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 425 [261 Cal.Rptr. 384, 777 P.2d 157]; *Department of Fish & Game* v. *Anderson-Cottonwood Irrigation Dist.*, *supra*, 8 Cal.App.4th at p. 1562.) At the same time, "[I]t is fundamental in our law that an administrative agency may not, under the guise of its rule-making power, abridge or enlarge its authority or act beyond the powers given to it by the statute which is the source of its power . . . ." (*Kerr's Catering Service* v. *Department of Industrial Relations* (1962) 57 Cal.2d 319, 329-330 [19 Cal.Rptr. 492, 369 P.2d 20].) "Administrative regulations that alter or amend the statute or enlarge or impair its scope are void . . . ." (*Morris* v. *Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697].)

 The Department has interpreted section 2081 as permitting take of an endangered species under agreements such as the agency agreement. The Director of the Department filed a declaration stating, "Since 1984, the Department has issued numerous permits and entered into numerous agreements under Section 2081 of the Fish and Game Code to allow the 'take' (as defined in Section 86 of the Fish and Game Code) of state-listed threatened or endangered species for various scientific purposes. Additionally, the Department has issued permits and entered into agreements under Section 2081, such as the one at issue in this case, which enable us to manage the populations and habitats of protected species where otherwise lawful activities may affect the species. Under these so-called '2081 MOUs [Memorandum of Understanding]', a person or public agency proposing an activity is

required to adhere to a strict set of biologically based conditions in carrying out the activity to ensure that impacts to the protected species are avoided or minimized. Additionally, such agreements typically require that the proponent of an activity replace any habitat of a protected species which may be disturbed by the activity. This is accomplished by conveying to the Department or a designated third party habitat which is biologically comparable to that which has been disturbed or displaced. The proponent of the activity is required to provide funds for both the initial protection and the long-term management of the replacement habitat. As of June 30, 1994, the Department had entered into 80 such agreements throughout California."[9]

The Department contends issuance of a permit is consistent with the management objectives of CESA. However, CESA defines scientific resources management activities as "research, census, law enforcement, habitat acquisition, restoration and maintenance, propagation, live trapping, and, transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking." (§ 2061.)

As noted above, the Legislature followed FESA in many respects when it enacted CESA. In particular, the stated policies underlying the two statutes are virtually identical. (Compare sections 2051 and 2052 with 16 United States Code section 1531.) Yet, the California Legislature did not incorporate into CESA the preexisting federal permit process allowing take incidental to development and other lawful activities. "The omission of a provision contained in a foreign statute providing the model for action by the Legislature is a strong indication that the Legislature did not intend to import such provision into state statute. [Citation.]" (*J. R. Norton Co.* v. *General Teamsters, Warehousemen & Helpers Union* (1989) 208 Cal.App.3d 430, 442 [256 Cal.Rptr. 246].) Here, the fact that the federal incidental taking permit process existed before the drafting and passage of CESA convinces us that the Legislature deliberately chose not to adopt that provision into the state statute. Courts may not rewrite statutes to make express an intention not expressed in the statute itself. (*Id.* at p. 443.)

RCHCA further argues that if Audubon's interpretation is correct, section 2081 is redundant. Section 2081 allows taking for "scientific, educational, and management purposes." If management means scientific resources management, section 2081 would allow taking for scientific and educational

---

[9]Although the Director stated the Department had issued permits under section 2081 since 1984, Audubon asserts that the Department did not issue any "management" permits before 1989, and the permits issued before that date were permits for scientific or educational take. The record does not clarify the matter.

purposes and scientific resources management. In construing a statute, we avoid constructions that would treat statutory terms as surplusage. (See *Anthony* v. *Superior Court* (1980) 109 Cal.App.3d 346, 355 [167 Cal.Rptr. 246].)

However, a taking for scientific purposes is not necessarily the same as a taking for scientific management purposes. The former may encompass a taking for observation, study, or experimentation. The latter may encompass a taking for the conservation purposes set forth in section 2061. In fact, the implementation agreement repeatedly refers to scientific resources management. Thus, our construction of section 2081 would not render any term surplusage.

A determination that the agency agreement was invalid seems compelled by the legislative history, as well as the specific language and underlying policy of the statute. However, we need not decide the issue in this opinion. As we discuss below, we conclude RCHCA has established a meritorious defense of laches. Nonetheless, if we were faced with deciding the issue on the merits, we would conclude the agency agreement was invalid under CESA.

## II. *Laches*

### A. *Doctrine of Laches.*

RCHCA contends the action is barred by laches. (*Vernon Fire Fighters Assn.* v. *City of Vernon* (1986) 178 Cal.App.3d 710, 719 [223 Cal.Rptr. 871].) ■ Laches bars a mandamus action if the petitioner delays in initiating or prosecuting an action, and prejudice to the respondent results. (*Ibid.*) "The prejudice must be caused by the delay and may be of either a factual nature or some prejudice in the presentation of a defense." (*Ibid.*)

Whether laches exists is a question of fact for the trial court to determine "in light of all of the applicable circumstances, and in the absence of manifest injustice or a lack of substantial support in the evidence its determination will be sustained. [Citations.]" (*Miller* v. *Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624 [166 Cal.Rptr. 826, 614 P.2d 258].) However, when the underlying facts are undisputed, we may determine the issue as a matter of law. (See *Fahmy* v. *Medical Bd. of California* (1995) 38 Cal.App.4th 810, 814 [45 Cal.Rptr.2d 486].)

### B. *Delay in Initiating Lawsuit.*

■ The agency agreement was executed on October 4, 1990. Its related documents, the Short-Term Plan and the implementation agreement, were

dated March 16, 1990, and August 1, 1990, respectively. Audubon was a member of RCHCA's advisory committee at its inception in July 1990 and participated in RCHCA's board meeting on October 4, 1990, when RCHCA approved the agency agreement.

Audubon did not file the present action until April 16, 1992. RCHCA, its member agencies, and the utility companies were not joined as parties to the lawsuit until August 3, 1993.

C. *Prejudice to the Parties.*

Undisputed evidence showed that after entering into the agency agreement, RCHCA and its member agencies implemented the SKR management program. Among other things, they collected about $30 million in mitigation fees, acquired about 6,000 acres of SKR reserve habitat, obtained $1.2 million in direct funding from the state, completed environmental impact reports and environmental impact statements, and obtained a taking permit from the United States Fish and Wildlife Service. In addition RCHCA's member agencies approved various development projects.

RCHCA asserts that if the agency agreement were to be declared invalid, the entire SKR management program would come to a halt. All of the agreements that underlie the SKR management program would be nullified because they are all interdependent.

The Metropolitan Water District filed a separate brief to point out the far reaching effect invalidating the agency agreement would have on its operations. In reliance on the agency agreement, the Metropolitan Water District pursued the planning and construction of numerous capital projects for water storage and distribution, including the Domenigoni Valley Reservoir Project, the Inland Feeder Pipeline-Tunnel Project, the San Diego Pipeline Number Six Project, and San Diego Canal maintenance.

The Domenigoni Valley Reservoir Project has an anticipated completion date of mid-1999 and total anticipated costs of about $1.8 billion. In connection with the project, Metropolitan Water District has completed the take of 278 acres of occupied SKR habitat. In return, Metropolitan Water District dedicated about 1,400 acres of occupied SKR habitat through a conservation easement to the RCHCA.

The Inland Feeder Pipeline-Tunnel Project has an anticipated completion date of mid-1999 and total anticipated costs of about $920 million. In connection with the project, Metropolitan Water District will take about 20

acres of occupied SKR habitat. In return for a permit to take occupied SKR habitat, Metropolitan Water District has dedicated about 75 acres of occupied SKR habitat, agreed to pay RCHCA $196,500 to purchase SKR habitat, and agreed to restore the construction zone through a wildlife reserve.

The San Diego Pipeline Number Six Project has an anticipated completion date of mid-2000 and total anticipated costs of about $376 million. In connection with the project, Metropolitan Water District will take 11.4 acres of occupied SKR habitat.

In 1994, Metropolitan Water District completed maintenance of the San Diego Canal, which lies within 98 acres of occupied SKR habitat. In return for take of occupied SKR habitat in connection with the canal maintenance, Metropolitan Water District is providing SKR-occupied habitat to reserves.

### D. *Manifest Injustice.*

Laches was pleaded as an affirmative defense and addressed in the parties' trial briefs. The trial court did not address laches in its statement of decision; however, the evidence on the issue was distinctly one-sided and was undisputed. As set forth above, RCHCA has demonstrated extraordinary prejudice stemming from the delay in initiating a challenge to the agency agreement. Anything other than a decision in favor of RCHCA on the issue of laches would constitute a manifest injustice. (See *City of Coachella* v. *Riverside County Airport Land Use Com.* (1989) 210 Cal.App.3d 1277, 1286 [258 Cal.Rptr. 795].) When the facts are undisputed, we are free to determine the issue as a matter of law. (See, e.g., *Fahmy* v. *Medical Bd. of California*, *supra*, 38 Cal.App.4th at p. 814.)

Audubon did not address laches in its opening or reply brief. At trial, Audubon argued the doctrine of laches does not apply to a case involving the interpretation of a statute, citing *Teachers Management & Inv. Corp.* v. *City of Santa Cruz* (1976) 64 Cal.App.3d 438, 445 [134 Cal.Rptr. 523]. In that case, a development group sued to prevent the city from becoming a partner with the plaintiff in the development of a convention center on city-owned land. The developer raised the novel argument that laches barred the voters of the city from enacting the ordinance because the developer had expended sums in reliance on representations by the city council. The court rejected the argument, stating, "Laches is an affirmative defense to a suit in equity [citation]; the doctrine has no application to the effectiveness of a statute or ordinance." (*Id.* at p. 448.)

The present case is distinguishable. Here, laches is raised as an affirmative defense to a suit in equity because Audubon failed to bring a timely writ

petition. In *Teachers Management*, in contrast, a developer contended laches applied to the enactment of an initiative measure by the voters of a city. The court predictably declined to convert a traditional equity defense into a sword to be used offensively to overturn action by voters. Thus, *Teachers Management* provides no support to Audubon's position.

### E. *Failure of City and Developer to Plead Laches.*

At oral argument, Audubon raised the contention that laches is purely an individual defense; the City and developer failed to plead the defense below; and thus, the defense has been waived as to the City and the developer. Audubon is wrong on the facts. The City did plead the defense of laches. We address Audubon's argument with respect to the developer.

As a general rule, laches must be pleaded as an affirmative defense. (*Epperson* v. *Rosemond* (1950) 100 Cal.App.2d 344, 345 [223 P.2d 655].) However, courts in extraordinary cases have denied relief on their own motion when laches is disclosed by the complaint or appears from the evidence even if the defense has not been pleaded. (See, e.g., *Phoenix Mutual L. Ins. Co.* v. *Birkelund* (1946) 29 Cal.2d 352, 363 [175 P.2d 5].) This is such an extraordinary case. The validity of the entire agency agreement is at issue, and the defense of laches must therefore be available to all parties or none. The agreement cannot reasonably be severed because it contemplates a comprehensive solution to a regional problem. Thus, we conclude the developer's failure to plead the defense is not fatal; the defense was adequately raised and proved.

In light of Audubon's delay in initiating the lawsuit and the prejudice resulting to the respondents, we conclude as a matter of law that Audubon's petition was barred by laches.

### III. *Southern California Gas Company's Contentions*

Southern California Gas Company argues that Audubon's interpretation of CESA: (1) prevents Southern California Gas Company from fulfilling its obligations under the Federal Pipeline Safety Act (49 U.S.C. § 60101 et seq.) and thus is preempted by federal law; (2) results in a taking of property by eliminating all economic value in rights-of-way and pipelines in endangered species habitat; and (3) conflicts with the California Public Utilities Code in that it would cause ratepayers to bear an unreasonable financial burden if existing pipelines and other utility facilities had to be abandoned and reconstructed to avoid endangered species habitat. Because we affirm the trial court's decision on the ground of laches, all of Southern California Gas

Company's concerns are purely abstract and hypothetical questions. Their resolution must await an actual controversy.

### DISPOSITION

The judgment is affirmed. Each party shall bear its own costs on appeal.

Ramirez, P. J., and McKinster, J., concurred.

A petition for a rehearing was denied May 7, 1996, and respondents' petition for review by the Supreme Court was denied July 24, 1996. Baxter, J., was of the opinion that the petition should be granted.