[No. A117715. First Dist., Div. One. June 17, 2010.]

WATERSHED ENFORCERS, Plaintiff and Respondent, v.
DEPARTMENT OF WATER RESOURCES, Defendant and Respondent;
KERN COUNTY WATER AGENCY, Intervener and Appellant.

[No. A117750. First Dist., Div. One. June 17, 2010.]

WATERSHED ENFORCERS, Plaintiff and Respondent, v.
DEPARTMENT OF WATER RESOURCES, Defendant and Respondent;
SAN LUIS & DELTA-MENDOTA WATER AUTHORITY et al., Interveners
and Appellants.

972

---

---

**COUNSEL**

Kronick, Moskovitz, Tiedemann & Girard, Daniel J. O'Hanlon, Hanspeter Walter and Rebecca R. Akroyd for Intervener and Appellant Kern County Water Agency.

Diepenbrock Harrison, Andrea A. Matarazzo, Jon D. Rubin and Bradley B. Johnson for Interveners and Appellants San Luis & Delta-Mendota Water Authority et al.

Lozeau Drury, Michael R. Lozeau; Law Offices of Andrew L. Packard and Andrew L. Packard for Plaintiff and Respondent.

No appearance for Defendant and Respondent.

Edmund G. Brown, Jr., Attorney General, Mary E. Hackenbracht, Assistant Attorney General, John Davidson and Cecilia L. Dennis, Deputy Attorneys General, for California Department of Fish and Game as Amicus Curiae.

OPINION

**MARCHIANO, P. J.**—California's Department of Water Resources (DWR), a state agency, operates a pumping system that results in the taking of three endangered or threatened species of fish. Watershed Enforcers (Watershed), a project of the California Sportfishing Protection Alliance, a nonprofit corporation, filed a petition for writ of mandate to compel DWR to stop taking the fish species without permit authority under the California Endangered Species Act (CESA) (Fish & G. Code, § 2050 et seq.).[1] Appellants, three local water agencies, intervened in the mandate proceedings and argued CESA did not apply to DWR because it was not a "person" within the meaning of section 2080. The trial court rejected this argument, and went on to consider and reject DWR's separate arguments against mandamus relief.

The trial court granted the writ petition. DWR appealed, but then complied with the trial court's writ of mandate and dismissed its appeal. The interveners pursue their appeal, pressing their contention that a state agency is not a "person" for purposes of section 2080. Despite the appeal's mootness, we reach the merits because the issue is one of general public interest which is likely to recur.

■ We hold that a state agency is a "person" within the meaning of section 2080, which prohibits any "person" from taking an endangered or threatened species without appropriate permit authority from California's Department of Fish and Game (Department), as we explain below.

## I. STATUTORY FRAMEWORK

The Legislature enacted CESA in 1984. (Stats. 1984, ch. 1240, § 2, pp. 4243–4248; see *California Forestry Assn. v. California Fish & Game Commission* (2007) 156 Cal.App.4th 1535, 1540 [68 Cal.Rptr.3d 391] (*California Forestry Assn.*).)[2]

In section 2051, the Legislature found and declared that:

"(a) Certain species of fish, wildlife, and plants have been rendered extinct as a consequence of man's activities, untempered by adequate concern and conservation.

---

[1] Subsequent statutory references are to the Fish and Game Code unless otherwise indicated.

[2] Our discussion of CESA is not intended to be comprehensive; we discuss only those provisions pertinent to the issue on appeal.

"(b) Other species of fish, wildlife, and plants are in danger of, or threatened with, extinction because their habitats are threatened with destruction, adverse modification, or severe curtailment, or because of overexploitation, disease, predation, or other factors.

"(c) These species of fish, wildlife, and plants are of ecological, educational, historical, recreational, esthetic, economic, and scientific value to the people of this state, and the conservation, protection, and enhancement of these species and their habitat is of statewide concern."

In section 2052, the Legislature further found and declared "that it is the policy of the state to conserve, protect, restore, and enhance any endangered species or any threatened species and its habitat and that it is the intent of the Legislature, consistent with conserving the species, to acquire lands for habitat for these species."

And in section 2055, the Legislature found and declared "that it is the policy of this state that *all state agencies, boards, and commissions* shall seek to conserve endangered species and threatened species and *shall utilize their authority in furtherance of the purposes of* [CESA]." (Italics added.)

Article 3 of CESA governs the taking, importation, and sale of endangered and threatened species. Its key provision is section 2080: "No person shall import into this state, export out of this state, or take, possess, purchase, or sell within this state, any species, or any part or product thereof, that the [Fish and Game Commission] determines to be an endangered species or a threatened species, or attempt any of those acts, except as otherwise provided in [CESA], the Native Plant Protection Act . . . or the California Desert Native Plants Act . . . ." (Citations omitted.)

■ "Central to CESA" is section 2080's "prohibition on the taking of an endangered or threatened species. [Citation.] To 'take' in this context means to catch, capture or kill.[3] [Citation.] Nonetheless, CESA allows the [Department] to authorize a 'take' that is incidental to an otherwise lawful activity if certain conditions are met. [Citations.]" (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 507 [80 Cal.Rptr.3d 28, 187 P.3d 888] (*Environmental Protection Information*).)

■ Accordingly, section 2081 permits the Department to "authorize acts that are otherwise prohibited pursuant to Section 2080." Section 2081,

---

[3] The general definition of "take" in the Fish and Game Code is "hunt, pursue, catch, capture, or kill, or attempt to hunt, pursue, catch, capture, or kill." (§ 86.)

subdivision (a) provides: "Through permits or memorandums of understanding, the [D]epartment may authorize individuals, *public agencies*, universities, zoological gardens, and scientific or educational institutions, to import, export, take, or possess any endangered species [or] threatened species . . . for scientific, educational, or management purposes." (Italics added.)

But a section 2081, subdivision (a) taking is subject to stringent conditions, as set forth in subdivision (b)(1) and (2):

"The [D]epartment may authorize, by permit, the take of endangered species [or] threatened species . . . if all of the following conditions are met:

"(1) The take is incidental to an otherwise lawful activity.

"(2) The impacts of the authorized take shall be minimized and fully mitigated. The measures required to meet this obligation shall be roughly proportional in extent to the impact of the authorized taking on the species. Where various measures are available to meet this obligation, the measures required shall maintain the applicant's objectives to the greatest extent possible. All required measures shall be capable of successful implementation. For purposes of this section only, impacts of taking include all impacts on the species that result from any act that would cause the proposed taking."

■ In referring to section 2081, subdivision (b), our Supreme Court declared: "At the heart of CESA is the obligation to mitigate [authorized] takes." (*Environmental Protection Information, supra*, 44 Cal.4th at p. 507.)

Subdivision (c) of section 2081 provides, in part, that "No permit may be issued pursuant to subdivision (b) if issuance of the permit would jeopardize the continued existence of the species."

At issue in this case is whether the above statutory framework applies to DWR, i.e., whether a state agency is a "person" within the meaning of section 2080. In the "General Definitions" chapter of the Fish and Game Code (div. 0.5, ch. 1, § 1 et seq.), the Legislature defines "person" in section 67: " 'Person' means any natural person or any partnership, corporation, limited liability company, trust, or other type of association." But the Legislature also declared a proviso: "*Unless the provisions or the context otherwise requires*, the definitions in this chapter govern the construction of this code . . . ." (§ 2, italics added.)

## II. FACTS AND PROCEDURAL BACKGROUND

The facts are undisputed. We take the facts from the trial court's statement of decision.

DWR operates the California State Water Project's (State Water Project) Harvey O. Banks Pumping Plant (Banks Pumping Plant) and related facilities. The integrated operation of the Banks Pumping Plant and its facilities constitutes a lawful activity "and is vitally important to significant numbers of people and businesses." The Banks Pumping Plant operation diverts "massive" amounts of California water from its natural flow to the ocean "to inland points south of the pumping plant." The Banks Pumping Plant operation "is the core of the State Water Project" and the State Water Project "cannot continue without it."

The Banks Pumping Plant operation causes "the unfortunate entrainment and loss of life of significant numbers of fish," including three species that are the subject of this litigation: winter-run chinook salmon; spring-run chinook salmon; and delta smelt. The Department has listed winter-run chinook salmon as an endangered species since 1989. The Department has listed spring-run chinook salmon and delta smelt as threatened species since 1999 and 1993, respectively.

Watershed is a nonprofit corporation with members who assert an interest in the enforcement of CESA. Watershed filed a petition for writ of mandate naming DWR and five of its employees as respondents. Watershed sought a writ to command DWR to cease the Banks Pumping Plant operation because DWR did not have the requisite permit or alternative authorization for the taking of the endangered and threatened fish species under CESA. Appellants Kern County Water Agency (Kern), San Luis & Delta-Mendota Water Authority, and Westlands Water District intervened in the mandate proceedings.[4]

Kern—but not DWR—argued that DWR was not a "person" within the meaning of section 2080. The trial court rejected this argument, reasoning as follows: "Section 2081(a) provides an exception to the requirements of [section] 2080 and includes in the exception the specific authorization to the [Department] to issue permits to public agencies. This evidences an apparent intention on the part of the Legislature that public agencies fall within the provisions of . . . CESA. It would be nonsense to create an exception to [section] 2080 by passage of [section] 2081(a) if [section] 2080 did not apply to public agencies. . . ."

The trial court also cited three "cases in which the Court of Appeal has applied CESA to a state agency": *Department of Fish & Game v. Anderson-Cottonwood Irrigation Dist.* (1992) 8 Cal.App.4th 1554 [11

---

[4] Two other water agencies and State Water Contractors intervened, but are not parties to this appeal.

Cal.Rptr.2d 222] (*Anderson-Cottonwood*); *San Bernardino Valley Audubon Society v. City of Moreno Valley* (1996) 44 Cal.App.4th 593 [51 Cal.Rptr.2d 897] (*Moreno Valley*); and *San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (1999) 71 Cal.App.4th 382 [83 Cal.Rptr.2d 836] (*Metropolitan*).[5] The court noted that "the parties have not cited the Court to any case holding that the provisions of . . . CESA may not be applied to a public entity on account of its status as a public agency."

The trial court went on to consider, in some detail, DWR's substantive argument that it had satisfied CESA by complying with section 2081.1, a provision which "grandfathered" in certain agreements entered into with the Department prior to January 1, 1998, authorizing the incidental take of endangered species. The court rejected DWR's argument. The trial court granted the mandate petition and ordered DWR to cease operation of the Banks Pumping Plant operation until and unless DWR obtained from the Department "authorization in compliance with" CESA for the incidental taking of the three fish species.

DWR and the three interveners appealed. During the pendency of its appeal, DWR complied with the trial court's writ by obtaining proper authorization from the Department in compliance with CESA for the incidental taking of the three fish species. Accordingly, DWR requested dismissal of its appeal. We granted the request and dismissed DWR's appeal. We therefore need not, and do not, discuss the trial court's reasoning for finding DWR in noncompliance with CESA.

What remains before us, in these two consolidated appeals, is the interveners' argument that DWR is not a "person" within the meaning of section 2080. This is solely a question of statutory interpretation.

## III. DISCUSSION

### A. Mootness

■ Watershed has moved to dismiss the interveners' appeals on the ground that this case is moot. Watershed notes, correctly, that DWR has complied with the trial court's writ. Thus, this case is moot. Nevertheless, we will decide the issue of statutory interpretation on its merits because of the importance of the issue. We have the inherent discretion to consider a moot issue if it raises a matter of general public interest that is likely to recur. (*Californians for Alternatives to Toxics v. Department of Pesticide Regulation*

---

[5] The trial court cited a fourth case in which review was granted and then dismissed. As such, the case has no precedential value.

(2006) 136 Cal.App.4th 1049, 1069 [39 Cal.Rptr.3d 393]; *Schraer v. Berkeley Property Owners' Assn.* (1989) 207 Cal.App.3d 719, 728 [255 Cal.Rptr. 453].) The interpretation or scope of application of a statute would typically be a matter of general public interest. (See, e.g., *Rawls v. Zamora* (2003) 107 Cal.App.4th 1110, 1113 [132 Cal.Rptr.2d 675].)

The statute at issue is the core of CESA's provisions regarding the taking of endangered or threatened species. Whether that statute applies to public agencies—whose activities are, it would seem, likely to result in more expansive takings than those of individual hunters and fishermen—is clearly an issue of general public interest. The interpretation of section 2080 will affect a broad swath of public agency activities. Furthermore, the applicability of section 2080 to state agencies is undoubtedly an issue likely to recur.[6] The application of the statute to DWR is of paramount interest to significant issues affecting California water allocation, the State Water Project, and the California Water Plan.

The issue has been fully briefed and involves only an exercise of interpretation on undisputed facts. We will determine the issue on its merits. Watershed's motion to dismiss the appeals is denied.

### B. The Merits

The interpretation of a statute, especially on undisputed facts, is a question of law we review de novo. (See *California Forestry Assn., supra,* 156 Cal.App.4th at p. 1544.)

■ "The fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citation.]" (*O'Kane v. Irvine* (1996) 47 Cal.App.4th 207, 211 [54 Cal.Rptr.2d 549].) "To determine the intent of legislation, we first consult the words themselves, giving them their usual and ordinary meaning. [Citations.]" (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].) Other courts refer to the "plain and commonsense meaning" of statutory language. (*People v. Cole* (2006) 38 Cal.4th 964, 975 [44 Cal.Rptr.3d 261, 135 P.3d 669] (*Cole*); see *People v. Murphy* (2001) 25 Cal.4th 136, 142 [105 Cal.Rptr.2d 387, 19 P.3d 1129].)

"We do not, however, consider the statutory language in isolation; rather, we look to the entire substance of the statutes in order to determine their scope and purposes. [Citation.] That is, we construe the words in question in

---

[6] The parties agree that the issue has already been raised in the Superior Court of Kern County.

context, keeping in mind the statutes' nature and obvious purposes. [Citation.] We must harmonize the various parts of the enactments by considering them in the context of the statutory frame work as a whole. [Citation.] If the statutory language is unambiguous, then its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history. [Citation.]" (*Cole, supra*, 38 Cal.4th at p. 975.)[7]

■ Furthermore, "statutes must be given a reasonable and common sense construction in accordance with the apparent purpose and intention of the lawmakers—one that is practical rather than technical and that will lead to a wise policy rather than to mischief or absurdity [citation]." (*People v. Hinojosa* (1980) 103 Cal.App.3d 57, 65–66 [162 Cal.Rptr. 793].) We must construe a statute to comport with apparent legislative intent and with a view to furthering, not defeating, the general statutory purpose. (*California Forestry Assn., supra*, 156 Cal.App.4th at p. 1545.) And where statutory meaning is uncertain, "we may also consider the consequences of a particular interpretation, including its impact on public policy. [Citations.]" (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190 [48 Cal.Rptr.3d 108, 141 P.3d 225] (*Wells*).)

■ We also note the general rule that " '[l]aws providing for the conservation of natural resources' such as . . . CESA 'are of great remedial and public importance and thus should be construed liberally.' [Citation.]" (*California Forestry Assn., supra*, 156 Cal.App.4th at p. 1545, quoting *Moreno Valley, supra*, 44 Cal.App.4th at p. 601.)

With these guiding principles of legal semantics in mind, we now turn to the question of whether a state agency is a "person" within the meaning of section 2080, one of first impression.

Interveners correctly note that the term "person," standing alone, is "notoriously ambiguous." (*Diamond View Limited v. Herz* (1986) 180 Cal.App.3d 612, 616 [225 Cal.Rptr. 651].) For this reason, "person" is often "defined, in varying ways, in the preliminary provisions of the different codes." (*Ibid.*) As we have noted, the Legislature defined "person" in section 67 as follows: " 'Person' means any natural person or any partnership, corporation, limited liability company, trust, or other type of association."

We agree with interveners that the literal textual meaning of this definition would seem to exclude state agencies. Obviously, a state agency is not a

---

[7] Justice Oliver Wendell Holmes, Jr., explained statutory construction: "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." (*Towne v. Eisner* (1918) 245 U.S. 418, 425 [62 L.Ed. 372, 38 S.Ct. 158].)

natural person or any of the types of business organizations listed in section 67. And we cannot overlook the Legislature's ability to expressly define "person" to include a public entity. For instance, at least one provision of the Fish and Game Code unrelated to CESA defines "person" to expressly include government agencies. (§ 711.2, subd. (b).) Evidence Code section 175 defines "person" as "a natural person, firm, association, organization, partnership, business trust, corporation, limited liability company, or public entity." As our Supreme Court has pointed out, there are numerous statutory examples showing "that legislators know how to include [public] entities directly when they intend to do so." (*Wells, supra,* 39 Cal.4th at p. 1190; see *id.* at pp. 1190–1191 & fn. 14.)

But section 67 is subject to the proviso of section 2, which allows an alteration, and a legally permissible expansion of the specific statutory definition if "the provisions or the context otherwise requires." This proviso, along with our duty to construe section 2080 to effect the Legislature's intent and to promote the resource conservation purposes and policies of the CESA statutory scheme, poses a serious question whether the definition of "person" is limited to the exact language of section 67.[8]

Other statutory language emphasizes CESA's application to public agencies. Section 2053 declares it is the policy of this state that "state agencies should not approve projects as proposed which would jeopardize the continued existence of any endangered species or threatened species . . . if there are reasonable and prudent alternatives available consistent with conserving the species or its habitat which would prevent jeopardy. . . ." Section 2055 declares it is the policy of this state that all state agencies "shall seek to conserve endangered species and threatened species and shall utilize their authority in furtherance of the purposes of" CESA.

■ Moreover, the language of section 2081, on which the trial court based its ruling, also supports an interpretation of "person" to include state agencies. Section 2081 exempts several entities, including public agencies, from the section 2080 prohibition. It is illogical to expressly exempt an entity from a prohibition that did not apply to it in the first place. Therefore, section 2080 must apply to public entities or the exemption for public agencies in section 2081 is rendered surplusage—a result we must generally avoid.[9] (See *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 249 [127 Cal.Rptr.2d 177, 57 P.3d 654].)

---

[8] We recognize that the "context" provision of section 2, by itself, is not conclusive. A similar proviso is contained in the Evidence Code, which expressly defines "person" to include a public entity (Evid. Code, §§ 2, 175), but is also contained in the Vehicle Code, which does not (Veh. Code, §§ 100, 470).

[9] In challenging the trial court's reasoning here, and elsewhere in its arguments, Kern makes a distinction between "state agency" and "public agency." In the current context the distinction

The language of CESA contains specific provisions for the protection of endangered and threatened species and was enacted in 1984, long after the 1957 enactment of the Fish and Game Code's general definition of "person." The statutory language, taken as a whole, and including sections 2053, 2055, and 2081, strongly supports a conclusion that the Legislature intended state agencies to be "persons" under section 2080.

We note, however, that the three decisions relied upon by the trial court do not directly support this conclusion.

*Anderson-Cottonwood* involved the application of section 2080 to a public agency, the Anderson-Cottonwood Irrigation District, whose operation of a pump diversion facility resulted in the killing of endangered winter-run chinook salmon. (*Anderson-Cottonwood, supra*, 8 Cal.App.4th at pp. 1558–1560.) The issue of whether the district was a "person" under the statute was not raised, but assumed: the question posed by the case was whether the taking proscribed by the statute was limited to hunting and fishing or encompassed lawful irrigation activity. (*Id.* at pp. 1558, 1561–1564.)

The court ruled the statutory definition of "take" (§ 86) was broad and included killing by any means; the definition contained no limitation to hunting- and fishing-related activities. (*Anderson-Cottonwood, supra*, 8 Cal.App.4th at pp. 1562–1563.) The court held such a limited interpretation would "lead to absurd results in light of the clear policy statement of legislative purpose. [Citation.]" (*Id.* at p. 1563.) The court relied on the legislative policy in sections 2051 and 2052. (8 Cal.App.4th at p. 1563.) "Thus, CESA makes clear that its intent is to protect fish, not punish fishermen. It is inconceivable that a statutory scheme, the purpose of which is to protect natural resources, should be construed to allow the wholesale killing of endangered species simply because the mode of death does not involve hunting or fishing." (*Id.* at pp. 1563–1564.) Thus, section 2080 "prohibits the killing of endangered species in the course of lawful activity." (8 Cal.App.4th at p. 1564.)

*Moreno Valley* involved an agency agreement between the Department and several public entities. The agreement was considered a permit under section 2081, and allowed for the taking of an endangered species incidental to private development. (*Moreno Valley, supra*, 44 Cal.App.4th at pp. 597–599.) Again, whether the public entities were "persons" was not at issue. At issue was whether CESA prohibited the taking of endangered species incidental to private development. (44 Cal.App.4th at p. 600.) The court suggested that

---

is meaningless. The question before us is whether a "person" under section 2080 includes a public or government entity as opposed to a natural person or business organization.

CESA prohibited a taking for such a purpose. (44 Cal.App.4th at pp. 600–605.) But the court did not decide the issue, resolving the case on the issue of laches. (*Id.* at pp. 605–608.)

*Metropolitan* also involved an incidental taking for expected private development. (*Metropolitan, supra*, 71 Cal.App.4th at pp. 386–389, 402–403.) Again, the question of whether a public entity was a person was not decided. It was tacitly assumed that the public entity in that case, the Metropolitan Water District, was a "person" under section 2080. (71 Cal.App.4th at pp. 402–403.)

■ Cases are not authority for propositions they do not consider. (*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 900, fn. 7 [80 Cal.Rptr.3d 690, 188 P.3d 629].) But in the context of preservation of endangered and threatened species, would it be logical for the Legislature to exempt government agencies from the CESA taking prohibition, when those agencies operate large enterprises (dams, pumping stations, irrigation systems, etc.) while covering individual hunters and fishermen and business associations, which would generally take species in fewer numbers and in narrower scope? From a logical policy perspective, we think not. This perhaps helps explain why three published decisions have assumed section 2080 applies to public agencies, why the agencies did not challenge the application in those cases, why DWR did not challenge it in the present case, and why CESA existed for over two decades before anyone raised this issue.

■ This brings us to the issue of the interpretation of CESA by its implementing agency, the Department. While we exercise our independent judgment in interpreting a statute, we will give deference to an agency's interpretation if warranted under the circumstances of the agency's actions. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8 [78 Cal.Rptr.2d 1, 960 P.2d 1031]; *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 722–723 [39 Cal.Rptr.3d 189].) The Department, as amicus curiae in the present proceedings, asks us to defer to its administrative regulations implementing the incidental take permitting process.

Section 2081, subdivision (d) gives the Department the authority to adopt these regulations, which are codified at California Code of Regulations, title 14, section 783.0 et seq. and are intended to "implement[] Section 2080 and Section 2081 . . . ." (Cal. Code Regs., tit. 14, § 783.0.)[10]

The Department's regulations contemplate that the incidental take permitting process applies to state agencies. Code section 783.1 essentially restates

---

[10] We refer to sections of the California Code of Regulations, title 14 as "Code section."

the language of section 2080, i.e., that no "person" may take an endangered or threatened species except as provided by several listed laws or "as authorized under [the regulations] in an incidental take permit." (Cal. Code Regs., tit. 14, § 783.1, subd. (a).)

Code section 783.2, which governs permit applications, requires additional information in the application if the applicant "is a corporation, firm, partnership, association, institution, or public or private agency . . . ." (Cal. Code Regs., tit. 14, § 783.2, subd. (a)(1).) Code section 783.6, which governs transfers of permits, exempts the transfer of a permit from Department approval when there is a "sale, merger, annexation, consolidation or other acquisition of an institutional, corporate or public entity permit holder by another entity." (Cal. Code Regs., tit. 14, § 783.6, subd. (a)(2)(A).) And, in a special order governing the incidental take of a salmon species being considered for threatened or endangered status, the regulations specifically permit the "[t]ake of Sacramento River spring-run chinook salmon . . . incidental to operation of the State Water Project facilities . . . ." (Cal. Code Regs., tit. 14, § 749, subd. (a)(4).)

Thus, the Department considers a state agency to be a "person" subject to the incidental take permitting process.

We thus conclude that, given the context and policies of CESA, including the policy of species preservation made expressly applicable to state agencies, as well as the statutory language expressly referring to state agencies, that a state agency is a "person" within the meaning of section 2080. Additionally, interpreting section 2080 to exclude state agencies would lead to the unreasonable result that major actors, whose operations result in the taking of endangered and threatened species, would be exempt from the general take prohibition.

Interveners present no applicable or persuasive authority to support their proposed interpretation of section 2080.

Interveners rely on a 1984 Attorney General opinion, which concluded that section 67 did not apply to state or local government agencies because such agencies were not an "other type of association" within the meaning of the statute. (67 Ops.Cal.Atty.Gen. 355, 360 (1984).) But this conclusion was made within the context of potential criminal liability for violations of sections 1601 and 1603, that prevent diversion of stream flow without notice to the Department. The Attorney General opinion is based on the general inapplicability of the Penal Code to "bodies politic," i.e., state and local government agencies, as opposed to natural persons and corporations.

(67 Ops.Cal.Atty.Gen., *supra*, at p. 359, fn. 5; see Pen. Code, § 7.) Since criminal liability is not at issue in this case, the Attorney General opinion is distinguishable.[11]

Interveners also rely on an August 5, 2008 memorandum of a deputy attorney general, written to advise the Delta Vision Blue Ribbon Task Force regarding "the legal tools available under the California Fish and Game Code to protect threatened, endangered and other imperiled species, which may have the effect of reducing and/or reallocating water use for ecosystem protection purposes." We have taken judicial notice of the memorandum. While expressing an opinion that state and local government agencies are not "persons" under section 67, the memorandum acknowledges the trial court's ruling in the present case and does not disagree with it. We do not find the memorandum to be persuasive authority for interveners' position.

In addition, interveners rely on *Wells*, in which our Supreme Court concluded that a public school district was not a "person" which could be sued under California's False Claims Act (CFCA; Gov. Code, § 12650 et seq.). (*Wells, supra*, 39 Cal.4th at p. 1179.) CFCA defines "person" in essentially the same manner as section 67. (Gov. Code, § 12650, subd. (b)(8); see *Wells, supra*, at p. 1190.) The court noted that "the statutory list of 'persons' contains no words or phrases most commonly used to signify public school districts, or, for that matter, any other public entities or governmental agencies." (*Wells, supra*, at p. 1190.)

But *Wells* is distinguishable. First, the CFCA definition of "person" originally *included* governmental agencies, but was amended to *delete* government agencies prior to the adoption of CFCA. This was a significant indicator of a legislative intent that government agencies were not "persons" under CFCA. (*Wells, supra*, 39 Cal.4th at pp. 1191–1192.)

Second, *Wells* was decided in a different context from the present case. The linchpin of the *Wells* ruling was the financial protection of public school districts from the "draconian liabilities of the CFCA" which include double and treble damages. (*Wells, supra*, 39 Cal.4th at p. 1193; see *id.* at pp. 1196–1197.) The court reasoned the Legislature could not have intended to subject budgetarily restrained and financially strapped school districts to such liabilities, given their responsibility to provide free public education. (*Id.* at pp. 1193–1197.)

---

[11] While an Attorney General opinion is entitled to our respect and careful consideration, it does not bind this court. (See *Thorning v. Hollister School Dist.* (1992) 11 Cal.App.4th 1598, 1604 [15 Cal.Rptr.2d 91].)

Here, we are not dealing with a statute that imposes financial liabilities. We are dealing with a statute intended to preserve precious natural resources. The rationale for the *Wells* holding simply does not apply here.[12]

Interveners fashion an argument based on the federal Endangered Species Act of 1973 (FESA) (16 U.S.C. § 1531 et seq.) and *Moreno Valley.* "CESA was in large part modelled upon FESA," which was enacted in 1973. (*Moreno Valley, supra,* 44 Cal.App.4th at p. 603; see *id.* at p. 602.) At the time CESA was enacted in 1984, a FESA provision permitted an incidental taking for private development under certain circumstances. (44 Cal.App.4th at p. 602.) When the Legislature enacted CESA it did not include this FESA provision. (44 Cal.App.4th at p. 603.) The *Moreno Valley* court concluded that the absence of the FESA provision showed that "the Legislature deliberately chose not to adopt that provision into the state statute." (44 Cal.App.4th at p. 604.)

Interveners observe that at the time CESA was enacted, FESA expressly defined "person" to include state agencies. (Pub.L. No. 93-205, § 3, subd. (8) (Dec. 28, 1973) 87 Stat. 884.) Interveners argue the failure to include state agencies in the CESA definition of person shows an intent that state agencies not be considered persons. The flaw in this argument is that "person" was defined by the Fish and Game Code in 1957, *before* the enactments of both FESA and CESA. We cannot read significant meaning into the Legislature's failure to revisit a general definition statute almost three decades old when it enacted CESA. We certainly do not see the type of express rejection of a FESA provision at issue in *Moreno Valley.*

Interveners also fashion an argument based on former article 4 of CESA, former sections 2090 through 2097. Former article 4 was enacted in 1984, but was sunsetted on January 1, 1999. (Stats. 1984, ch. 1240, § 2, pp. 4243, 4246–4248; former § 2097, as amended by Stats. 1993, ch. 337, § 1, p. 2107.) The article was entitled "State Agency Consultation" and, as described by the Department in its amicus curiae brief, "provided an alternative means for state agencies to obtain authorization to take an endangered or threatened species."[13]

---

[12] Dicta in the *Wells* discussion suggests its interpretation of "person" would apply to government agencies in general, not just school districts. But the rationale of the reasoning is still to protect entities from severe financial hardships caused by damage judgments, sometimes of double and treble damages. Those considerations do not obtain here.

[13] In the ensuing discussion, we refer to the specific statutory provisions of former article 4 without constantly repeating the word "former"—as it is obvious to the reader the provisions are no longer in effect.

Section 2090 provided that state agencies designated as "lead agencies" of projects subject to the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) must consult with the Department "to ensure that any action authorized, funded, or carried out by the state lead agency is not likely to jeopardize the continued existence of any endangered or threatened species." (§ 2090, subd. (a).)

Section 2091 provided that "[i]f jeopardy is found, the [D]epartment shall determine and specify to the state lead agency reasonable and prudent alternatives consistent with conserving the species which would prevent jeopardy to the continued existence of the species or the destruction or adverse modification of the habitat essential to the continued existence of the species. . . . If a taking incidental to the project is found, the [D]epartment shall determine and specify to the state lead agency reasonable and prudent measures that are necessary and appropriate to minimize the adverse impacts of the incidental taking. [¶] Any taking that is in compliance with the alternatives or measures specified under this subdivision is not prohibited by" CESA.

Section 2092, subdivision (a) provided that if consultation with the Department pursuant to section 2090 lead to a finding of jeopardy, "the state lead agency shall require reasonable and prudent alternatives consistent with conserving the species which would prevent jeopardy." (§ 2092, subd. (a).) Section 2092, subdivision (b) provided that "[i]f specific economic, social, or other conditions make infeasible the alternatives prescribed in subdivision (a), except as provided in subdivision (c), the state lead agency may approve a project when jeopardy is found . . ." as long as certain conditions are met—including "reasonable mitigation . . . measures as are necessary and appropriate to minimize the adverse impacts of the project upon the endangered species or threatened species . . . ." (§ 2092, subd. (b)(1).) Section 2092, subdivision (c) provided that "[a] state lead agency shall not approve a project which would likely result in the extinction of any endangered species or threatened species." (§ 2092, subd. (c).)

Interveners claim that these provisions of former article 4 show a legislative intent to treat state agencies differently from the "persons" defined in section 67, and to exempt state agencies from the take prohibition of section 2080. We see no such intent. Former article 4 provided an alternate means for a state agency to obtain authorization for an otherwise prohibited take, through consultation with the Department and implementing alternatives or mitigation measures to minimize the incidental taking of an endangered or

threatened species. By stating in section 2091 that a taking in compliance with former article 4 was "not prohibited by" CESA, the Legislature acknowledged that a taking *not in compliance* with former article 4 *was prohibited* by CESA. That is, the section 2080 take prohibition *did* apply to state agencies and former article 4 merely provided an alternative means for a state agency to obtain proper take authorization.[14]

Interveners also base an argument on sections 2053 and 2054, additional findings and declarations made by the Legislature in enacting CESA.

In section 2053, the Legislature finds and declares that "it is the policy of the state that *state agencies* should not approve projects as proposed which would jeopardize the continued existence of any endangered species or threatened species . . . if there are reasonable and prudent alternatives available consistent with conserving the species or its habitat which would prevent jeopardy. [¶] [R]easonable and prudent alternatives shall be developed by the [D]epartment, together with the project proponent and the *state lead agency*, consistent with conserving the species, while at the same time maintaining the project purpose to the greatest extent possible." (Italics added.)

In section 2054, the Legislature provides that "in the event specific economic, social, or other conditions make infeasible such alternatives, individual projects may be approved if appropriate mitigation and enhancement measures are provided."

Interveners argue that these two sections demonstrate "a carefully considered approach to state agencies," and that interpreting section 2080 to apply to state agencies would conflict with section 2054. Interveners posit a case where a project would cause a take, would jeopardize a species, and there are no feasible alternatives. Interveners claim that in such a case section 2054 would allow the take, but section 2080 would not, because section 2081, subdivision (c) prohibits the Department from issuing a permit where to do so would jeopardize the existence of the species.

This argument is flawed for two reasons. First, sections 2053 and 2054 were linked to the now-defunct consultation provisions of former article 4. As

---

[14] Interveners rely on a 1998 report prepared by the California Research Bureau, at the request of state Senator Byron Sher, which expresses an opinion that the sunsetting of former article 4 rendered CESA inapplicable to state agencies. The report is essentially the opinion of one bureau staff member, and is based on a narrow reading of the definition of "person" in section 67. We disagree with the conclusions of the staff report.

the August 5, 2008 Attorney General memorandum observes, the sections were "keyed" to the consultation provisions and "[b]ecause the state agency consultation process sunset from [CESA] on January 1, 1999, the status and continued applicability of these legislative intent provisions is unclear."

■ Second, the posited conflict is a false one. Section 2054 does not say a state lead agency may approve a project that jeopardizes a threatened or endangered species. Indeed, section 2092, subdivision (c) precludes approval of a project that "would likely result in the extinction of any endangered species or threatened species." This is consistent with section 2081, subdivision (c). Section 2054 requires *mitigation measures* where there are no feasible alternatives. This is also consistent with the general take prohibition scheme, because section 2081, subdivision (b)(2) requires full mitigation of an incidental take.

Interveners contend that interpreting section 2080 to include state agencies would infringe upon DWR's sovereign function of operating the State Water Project. Interveners rely on the "well-settled rule of statutory construction that absent express language to the contrary, governmental entities are excluded from the operation of general statutory provisions which implicate the exercise of sovereign powers." (*Sacramento Mun. Utility Dist. v. County of Solano* (1997) 54 Cal.App.4th 1163, 1167 [63 Cal.Rptr.2d 286]; see *Wells, supra*, 39 Cal.4th at pp. 1192–1193.)

■ We question whether interveners have standing to assert the protection of DWR's sovereign powers, especially when DWR itself has not raised the issue but, indeed, has complied with the trial court's writ. In any event, express statutory language supports the application of section 2080 to state agencies. In addition to the language of CESA discussed above, the Water Code recognizes the Department's regulatory authority over state water projects. (Wat. Code, §§ 11160, 11900, 11901, 11917.)[15]

In conclusion, we hold that a state agency is a "person" within the meaning of section 2080. Therefore, we need not reach interveners' alternative contention that employees of a state agency are not "persons."[16]

---

[15] We thus reject interveners' argument that our interpretation of section 2080 is inconsistent with the Water Code. For the reasons stated in Watershed's respondent's brief, we likewise reject interveners' contention that our interpretation of section 2080 impairs the right of contract of bondholders, which it does not. Repayment of costs of the State Water Project are not derived solely from water sale revenues. Bondholders can be repaid from user charges and local property taxes of contracting entities. (See Wat. Code, § 11652.)

[16] We also do not reach interveners' contention that the issuance of a writ of mandate was procedurally inappropriate in this case. This issue is also moot.

## IV. DISPOSITION

The judgment granting a peremptory writ of mandate is affirmed.[17]

Dondero, J., and Banke, J., concurred.

The petition of all appellants for review by the Supreme Court was denied September 29, 2010, S184824.

---

[17] With respect to documents not discussed in this opinion, the pending motions for judicial notice are denied as moot.